## CLEWS *et al.* v. BARDON *et al.*

*(Circuit Court, E. D. Wisconsin.* November 22, 1888.)

1. BANKS AND BANKING—NATIONAL BANKS—LIABILITY OF DIRECTORS—EXCESSIVE LOANS.

A national bank was organized with a capital of $60,000. The promoter of the bank took 380 shares of stock in his own name, and procured the defendants to be directors, as well as a person to be elected cashier by them. The directors were not acquainted with the banking business. The proposed cashier was known to the directors, at least by reputation, and was supposed by them to be competent and trustworthy, and of considerable experience in the business, and they had full confidence in his integrity and ability to take charge of the bank. The cashier acted as manager of the loan and discount business of the bank, and the directors merely as advisers, when applied to. The promoter of the bank knew, and the other stockholders were presumed to know, that the directors were wholly unused to the banking business. *Held,* that the directors were not liable for the acts of the cashier in violation of the banking law, done without their participation or knowledge.

2. SAME.

The cashier made loans, in excess of 10 per cent. of the capital, to a manufacturing corporation supposed by him and by the public to be entirely solvent. None of the directors knew of the loans when made, but after a loan of $3,000 in excess of the lawful limit had been made, the cashier informed one of them of such loan, and was by him advised to call it in when due; and thereafter such director's advice was asked as to a further discount to the same corporation, and he disapproved of it, and it was not made. Afterwards further loans or discounts were made to the same corporation, without the knowledge or consent of any of the directors. About eight months after the bank commenced business, one or more of the debtors of the bank failed, and the directors thereupon took the active management into their own hands. *Held,* that none of the directors had knowingly violated, or knowingly permitted to be violated, any of the provisions of the banking law, and were not liable for such violation by the cashier.

3. SAME—OFFICERS MAY MANAGE BANK.

Under the banking law, the management of a national bank may be exercised either by the directors, or by the cashier or other officers; therefore the directors are not liable for the illegal or negligent acts of the cashier or other officers by whom the bank is managed, if they have no knowedge of such acts, and do not connive at them, or willfully shut their eyes and permit them.

4. SAME—COMMON-LAW LIABILITY.

It seems that the liability of directors of a national bank is substantially the same under the banking law as at the common law.

*(Syllabus by the Court.)*

In Equity. On final hearing.

*Wenzell & Tiffany, (John M. Gilman,* of counsel,) for complainants.
*Pinney & Sanborn,* for defendants.

BUNN, J. This suit is brought by the complainants as stockholders in the First National Bank of Superior, Wis., against the defendants as directors of said bank, to recover losses incurred by the bank in consequence of certain loans and discounts made by the bank, which turned

out to be bad, on the ground of the alleged negligence of the said directors in permitting such loans to be made in excess of the legal limit provided by the national banking act. The charge made by the complainants is that the directors negligently allowed the cashier of the bank, one T. K. Alexander, to make loans of money to the amount of $24,000, to the Paige-Sexsmith Lumber Co. and G. W. Sexsmith & Sons, in excess of the legal limit. Complainants also allege that the defendants, as such directors, negligently settled and compromised the several claims against these firms at 20 cents on the dollar, whereby a loss was also sustained by the bank. This is the substance of the complainants' claim against the directors. The action is brought, and the jurisdiction of this court invoked, under and by virtue of the provisions of the act of congress known as the "Banking Act;" which provisions are as follows:

"Sec. 5147. Each director shall take an oath that he will, so far as the duty devolves upon him, diligently and honestly manage the affairs of the association, and will not knowingly violate, or permit to be violated, any of the provisions of this act," etc.

"Sec. 5200. The total liabilities to any association of any person, or of any company, corporation, or firm, for money borrowed, including in the liabilities of a company or firm the liabilities of the several members thereof, shall at no time exceed one-tenth of the capital, etc. But the discount of bills of exchange drawn in good faith against actually existing values, and the discount of commercial or business paper actually owned by the person negotiating the same, shall not be considered as money borrowed."

"Sec. 5239. If the directors of any national banking association shall knowingly violate, or knowingly permit any of the officers, agents, or servants of the association to violate, any of the provisions of this title, all the rights, privileges, and franchises of such association shall be forfeited. * * * And in cases of such violation, every director who participated in or assented to the same shall be held liable in his personal and individual capacity for all damages which the association, its shareholders, or any other person, shall have sustained in consequence of such violation."

The question to be determined is whether or not the complainants make a case against the directors, under the provisions of law. There is not much dispute about the facts. The bank was organized in February, 1882, with a capital stock of $60,000, and D. M. Sabin, of Stillwater, chosen as its president. The promoter of the bank was one C. Edgar Haupt, who subscribed 380 out of 600 shares of stock, and obtained subscriptions for most of the other shares. He solicited and induced the defendants, who resided at Superior, to become directors, and to subscribe small amounts of stock and brought from St. Paul Mr. T. K. Alexander, who had been acting as cashier of the Second National Bank of St. Paul, and recommended him as a proper person to choose as cashier of the new bank, who was chosen on the organization of the bank to act as such; the directors taking a bond from him in the sum of $30,-000. Alexander was known to the directors at Superior, by reputation at least, and was supposed by all to be entirely competent and trustworthy, and of considerable experience in banking business. It appears that the directors and stockholders had full confidence in the integrity and ability of Alexander to take charge of and run the bank, and some

of the officers connected with the Second National Bank of St. Paul, where Alexander had acted as cashier, took stock to the amount of $14,-000 in the new bank, which was put in operation in May, 1882; Alexander acting as cashier and principal manager of the loans and discounts of the bank. The defendants never had any experience in banking business, and undertook to act as directors without compensation. Haupt was the originator and promoter of the bank. He virtually chose the directors and cashier, and, for himself and others, whom he represented, subscribed for most of the stock. He knew, and the other stockholders presumably knew, that the local directors were wholly unused to banking methods and business, and no doubt it was the general understanding of all interested that Alexander, with such assistance and advice as he might from time to time seek and obtain from the directors, was to manage the affairs of the bank. He, in fact, for the first seven or eight months, did mainly run the bank, and make all the loans and discounts; the directors giving such advice and information from time to time, in regard to the standing of customers, as the cashier required. From August 5 to August 20, 1882, the cashier loaned to the Paige-Sexsmith Lumber Co. $10,000, which was $4,000 in excess of the legal limit. No part of this amount was loaned with the knowledge or consent of either of the defendant directors. Alexander says in his testimony that he cannot recall how it came about that he violated the law, but he thinks that it was through carelessness; that the company stood so high financially that he thinks he was careless in the matter. After one loan of $3,000 and another of $6,000 had been made, Alexander told defendant Bardon that he had loaned the Paige-Sexsmith Lumber Co. $9,000 on the indorsement of the Sexsmiths and Paiges, and Bardon told him it was too much to loan to any one firm without security, inquired as to the time the notes ran, and advised him to call them in. Shortly after this, Alexander consulted with Bardon as to making a further loan to the same parties, and Bardon advised him not to make it, and it was not made. About August 20, 1882, Alexander made them a further loan of $1,000, without consulting with any of the directors. Afterwards, in the fall of 1882 and succeeding winter, Alexander discounted the notes of G. W. Sexsmith & Sons indorsed by Paige-Sexsmith Lumber Co., to the amount of $20,000 more, without consulting with the directors, and without their knowledge or consent. These parties were large lumber firms, doing business at Superior and at Fond du Lac, were well known to Alexander, and were of high standing financially. They were borrowing largely at several leading banks. Alexander says he got his information regarding their financial credit from one or two of the Oshkosh banks, from Bradstreet's, and from his knowledge of the firms at Superior. His answers to inquiries respecting their standing were all to the effect that they were of excellent standing, and good financial strength. Indeed, there is nothing in the evidence to show that the financial credit of these corporations and firms were at all suspected at the time the loans were made. Alexander says that he was familiar with the law, but that he did not think that the discount of the last $20,000 of notes came within the pro-

hibition, but that it was a discount of commercial or business paper, already owned and in circulation; that he had the law in mind, but did not think he was violating it. About January 1, 1883, some eight months after the bank was organized, one or more of the debtors of the bank having failed, the defendants, the resident directors, took the active management of the bank into their hands, and have run it ever since. The Paige-Sexsmith Lumber Co. and George W. Sexsmith & Sons soon after failed, and the directors, after a full investigation of their affairs, sold the notes the bank held against them for 20 per cent. of their face value, which was, no doubt, all that could be obtained for them, though it afterwards turned out, on settlement of their estates, that about 24½ per cent. were paid on these notes. But I think the directors acted prudently in making sale of the notes as they did. The comptroller of the currency at Washington ordered an assessment of 40 per cent. on the capital stock, to make good the losses, which was paid by the stockholders in full.

Though the testimony is quite voluminous, these seem to be the leading facts on which the case must be decided, and the question is whether there is enough proven on behalf of the complainants to make the defendants liable, under the provisions of the banking act, for the loss to the stockholders. There is not, if by a proper construction of the statute it is necessary to show that the directors had actual knowledge, or in some way participated in, connived at, or assented to, the violation of the law on the part of the cashier; because there is no evidence even tending to show any such knowledge, participation, or complicity on the part of directors. The evidence shows, on the contrary, that they had no knowledge of any such violation of the law until after it took place; nor did they approve or consent to it. But, as I understand the position of complainants' counsel, it is that such actual knowledge or consent need not be shown; that it is enough to show that the directors, who, by virtue of their office, are vested with the authority and duty to look into and manage the affairs of the bank, if they conferred that authority, and imposed that duty, upon the cashier, and allowed him to manage the bank,—that the directors are legally chargeable with knowledge of all that the cashier did. But I cannot think that such a mere constructive knowledge of or assent to the illegal acts of the cashier, in the circumstances of this case, is what is contemplated by the statute as sufficient to charge the directors personally, with all the consequences of such illegal acts. This might and probably would be so, if the exclusive duty of managing the active affairs of the bank was devolved upon the directors. But it seems clear enough that, under the law as it stands, and as it stood in 1882, the management of the bank might be intrusted either to the directors or to the cashier or other officers. If this was the case, then it would be just as legal and proper to intrust the matter of making loans and discounts to the cashier, as was done in this case, as to intrust the same duty to the directors. And every business man knows as a matter of common observation, throughout this part of the country at least, that business is generally left with the officers of the bank, rather

than with the directors. And in all such cases the position of a director would be intolerable if, having his own money invested in the bank, and himself acting without compensation, and having exercised all the diligence in his power in the proper selection of the officers, he were to be chargeable with the mistakes and shortcomings of such officers. I think the banking act places their liability upon the true ground, and that it stands about as it would in the like circumstances at the common law. In either case the director is bound to good faith. He must act honestly. He must not commit fraud, nor be privy to it, nor willfully shut his eyes, and abstain from making inquiries. If he has knowledge that an illegal transaction is to be enacted by the officers in charge, and consents to it, or connives at it, or willfully shuts his eyes, and permits it **to be done,** or is guilty of such gross and willful neglect of duty as **amounts** to bad faith, he will be held responsible. This was so at the common law, and is no doubt so under the banking act. But where the directors act in entire good faith, and select a person to manage the affairs of the bank, whom they have every reason to believe is competent and honest, they themselves having had no experience in banking, they have done just what the stockholders themselves would have done in the same circumstances. They have acted prudently, and with proper caution, as ordinarily prudent business men would act in reference to their own affairs. Under such circumstances, to hold them chargeable with knowledge of all the illegal acts of the person selected to manage the bank would be a harsh rule. The honor of being a resident director would scarcely compensate for such a responsibility. The directors, in this case, I think used all proper caution and diligence in the selection of a cashier. He was the person recommended by the principal stockholders, and the one in whom they placed their confidence. His reputation was good, and the directors had entire confidence in his honesty, and ability to run the bank; and, when they had reason to distrust his competency, they took the management of the bank into their own hands. The evidence does not even raise a suspicion that they did not act in entire good faith from first to last, and I think they acted with ordinary prudence and discretion. They had their own money invested in the stock of the bank. They were giving a portion of their time to forward the common interests of the bank, without pay. Under these circumstances, to hold them liable for the mistakes of the cashier, whom all trusted alike, in making loans in excess of the statutory limitation, to which the directors were not privy, nor consenting, would seem to be harsh and inequitable. And I cannot think that such a construction of the act of congress can be maintained, and I am the more confirmed in this view by the few adjudged cases that have arisen under these provisions. See *Movius* v. *Lee,* 30 Fed. Rep. 298; *Witters* v. *Sowles,* 31 Fed. Rep. 1. Also cases adjudged upon general principles of common law and equity jurisprudence, as follows: *In re Denham,* 25 Ch. Div. 752; *Dunn's Adm'r* v. *Kyle,* 14 Bush, 134; *Jones* v. *Johnson,* (Ky.) 6 S. W. Rep. 582; *Assignee* v. *Caperton,* (Ky.) 8 S. W. Rep. 885. The complainants' bill must be dismissed, with costs.