## McROBERTS v. SPAULDING et al.

District Court, S. D. Iowa, Central Division.
March 29, 1929.

No. 4346.

charge of loans made which were excessive under the prohibition of section 5200, U. S. R. S. (12 USCA § 84).

The bank was incorporated in the year 1883, and, at the time the loans complained of were made, had a paid up capital stock of $100,000, and an unimpaired surplus of $100,000. And as far as the excess loans were concerned, the case was tried upon the theory that the largest amount which the bank could legally loan to any one person was $20,000. The bank was taken over by the Comptroller of the Currency November 1, 1924.

The common-law negligence, as charged against the defendants, is based, as has been said, upon the claim that the parties to whom money was loaned were insolvent. The difficulty in the claim of the plaintiff in this regard is the uncertainty of values during the years from 1921 to 1924, which was the very heart of a period of deflation of farm land values and values of all kinds in Iowa.

The evidence shows, and the court will take judicial notice of, the banking situation, and the method and manner of its conduct prior to the deflation period, which started about the year 1920. The surety for country banks in Iowa and the basis of credit is real estate. From the time of the Civil War up to the year 1920, real estate in Iowa had a standard and fixed valuation, increasing gradually, and a person engaged in farming in Iowa prior to 1920, if honest and industrious, was worthy of credit. And the banks in Iowa generally loaned such individuals money or extended them credit, based upon the amount of property which they owned; and if the borrowers had real estate, upon the amount or equity in the real estate owned by such individual borrower.

At about the time of the breaking out of the World War in 1914, farming operations in Iowa became very profitable, and during the period of the war there was a gradual advance in prices, and Iowa was rich and prosperous. After the close of the war this prosperity took on a turn of speculation, which continued to grow and expand until the Federal Reserve Bank finally decided to stop the speculation by demanding the withdrawal of its loans. From this time there was started in Iowa a period of depression and panic which depreciated the value of all property and caused real estate values to decline, making their true value uncertain, and so reduced, that farms were considered as having the value of a conservative first mortgage.

As shown by the evidence, when this pe-

John H. Patton, of Grinnell, Iowa, Frank Bechly, of Montezuma, Iowa, and Robert J. Bannister, of Des Moines, Iowa, for plaintiff.

Parsons & Mills and Carr, Cox, Evans & Riley, all of Des Moines, Iowa, Thos. J. Bray and Byron W. Preston, both of Oskaloosa, Iowa, and Chas. Hutchinson, of Des Moines, Iowa, for defendants.

DEWEY, District Judge. This is a suit brought against certain directors of the Merchants' National Bank of Grinnell, Iowa, seeking recovery for loss alleged to have been sustained by the bank on account of negligently loaning money of the bank to parties claimed to have been insolvent at the time of such loans, and to recover on the alleged

riod of depression started in 1920, and during the time until the closing of this bank, November 1, 1924, it was generally thought by bankers and business men that the period of depression was temporary, and that values of real estate, which during that time were uncertain, would soon reach a stability that would enable business to again be transacted as before upon sound real estate values.

In retrospection it is easy to criticize the actions of the officers of the two or three hundred banks in Iowa that failed, with being derelict in their duties and making improvident loans, and yet, during all of the period in which it is charged that these defendants were negligent in making loans to individuals that were insolvent, the banking department of the state of Iowa was encouraging banks to remain open, having their directors sign guaranties of bank loans, and using every effort to maintain the former business relations, in the hope and expectation that such values would again become sound and substantial, and thus prevent the closing of banks with resultant loss to stockholders and creditors.

We are not here considering an ordinary bank failure caused by the mismanagement of the directors, but a situation that was caused by extraneous circumstances and conditions that could not be foreseen and the extent of which reasonable men could not at the time anticipate. And where bank officers, as in this case, made every reasonable effort to prevent the failure of their bank, they should not be criticized.

■ As shown by the testimony, other banks were following the same procedure as followed by the directors and officers in this case. It is stated in the case of Lyon v. Featherman, 80 Mont. 504, 512, 261 P. 268, 271: A director "cannot be held liable for losses on loans made in good faith at a time when any reasonably prudent banker would consider" them "for the best interest of the bank," even though in looking back they appear not to have been so. Directors are not liable for lawful loans made in good faith, although the making thereof was an error in judgment. 7 C. J. 790; Curtis v. Metcalf (D. C.) 259 F. 963.

■ The question of improvident loans is not what some one else might think about a loan, but the question is what the directors in making the loans thought, and the method and motive by which they were controlled in their actions.

Testing the actions of the directors in this case by the above rules, and the facts and circumstances surrounding them at the time, this court cannot say that the directors were negligent in making the loans that they did make, and which are charged in the petition as having been made improvidently and carelessly by such directors.

The difficult question involved in the case is not that of common-law liability for negligence, but the charge that the defendants had knowledge of and assented to certain loans to individuals and a partnership which, in each case, were in excess of the limit which the banking laws of the United States permit any bank to loan to a person or partnership.

The loans which are charged to have been excessive and made in violation of section. 5200, U. S. R. S., are as against five lines: (1) The J. E. Stewart and Louella Stewart loans; (2) the M. E. Sturgeon and Sadie Sturgeon loans; (3) the Ralph Sherman loans; (4) the John Puls loans; (5) the loans to the McFate and Roberts partnership, composed of Harvey McFate and Glenn A. Roberts.

The charge here is that the directors knowingly and willfully permitted loans to be made in each of the lines above enumerated in excess of that permitted by the laws relating to national banks. The National Bank Acts in force at the time of the transactions herein involved, section 5200 U. S. R. S. (12 USCA § 84), provides: "The total liabilities to any association of any person or of any company, corporation, or firm for money borrowed, including in the liabilities of a company or firm the liabilities of the several members thereof, shall at no time exceed ten per centum of the amount of the capital stock of such association, actually paid in and unimpaired, and 10 per centum of its unimpaired surplus fund."

■ And the statute then provides that the discount of certain paper by such association, where such paper is secured by certain existing values, shall not be considered as money borrowed within the meaning of the statute.

And Revised Statute 5239 (12 USCA § 93) provides: "If the directors of any national banking association shall knowingly violate, or knowingly permit any of the officers, agents, or servants of the association to violate any of the provisions of this chapter * * * every director who participated in or assented to the same shall be held liable in his personal and individual capacity for all damages which the association, its shareholders or any other person, shall have sustained in consequence of such violation."

In accordance with the plain provisions of these sections, a director who participates

in, or knowingly assents to an excessive loan, in this case over $20,000, is personally liable for the damages suffered thereby. And under the decisions of the federal Supreme Court, in order to recover from a director for losses on an excessive loan, it must be shown that the defendant while director participated in or assented to the excessive loan; not through negligence merely, but knowingly, and in effect, intentional. Corsicana National Bank v. Johnson, 251 U. S. 68, 40 S. Ct. 82, 64 L. Ed. 141.

So if a director has no actual knowledge of an excessive loan and has no knowledge of facts which would put him on inquiry, he cannot be held for the resultant loss. First Nat. Bank of Fairbanks v. Noyes (C. C. A.) 257 F. 593.

And it has been held that directors are not constructively chargeable with knowledge of the cashier to whom the business of the bank has been intrusted by the directors who have acted with proper precaution. Clews v. Bardon (C. C.) 36 F. 617; Cooper v. Hill (C. C. A.) 94 F. 582; First Nat. Bank of Fairbanks v. Noyes (C. C. A.) 257 F. 593.

But the absence of any improper motive or desire for personal profit on the director's part is no defense to an action for violation of the statute. Corsicana Nat. Bank v. Johnson, supra.

In this case the plaintiff seeks to recover the full amount due from the borrower as shown by the books of the bank at the time it closed its doors on November 1, 1924. But the defense claims, and the court feels rightfully so, that a renewal and consolidation of former loans does not constitute a new and single transaction.

It is held in the case of the Corsicana National Bank v. Johnson, supra, that the entire sum loaned, plus the interest and less salvage, should be treated as the damages sustained, and not merely the excess above what lawfully might have been loaned *when the entire excess loan formed but a single transaction.* The inference in this case being that, if, in good faith and in the ordinary course of business, the defendants made a loan equal to the amount authorized, and later, while this loan remained unpaid, as a separate transaction, unlawfully loaned additional money in excess of the prescribed limit, the damage legally attributable to their violation of the limiting provisions would be the amount of the excess loan, and not the full amount. Rankin v. Cooper (C. C. A.) 149 F. 1010, 1018; Gamble v. Brown (C. C. A.) 29 F.(2d) 366, 375; Curtis v. Metcalf (D. C.) 265 F. 293, 297.

The question also arises, and it is claimed by the plaintiff, that, where several loans are made to an individual for money borrowed from the bank, and later these notes are taken up and a new note given, constituting a renewal for the amounts already owed, this would constitute a new loan, and the directors involved would be liable for the full amount thereof as damages. The court is satisfied that this is not the true rule, but that the court should look beyond the giving of notes in any particular case to find out what was the real and true transaction. If money in the bank was misapplied without the knowledge or approval of the directors, subsequent renewals of such paper, upon which nothing was added but accrued interest, would not amount to a new loan for borrowed money. Curtis v. Metcalf (D. C.) 265 F. 296; Coffin v. U. S., 162 U. S. 677, 16 S. Ct. 943, 40 L. Ed. 1109.

A renewal *is* not a loan, it is an extension of time of payment. Brown v. Marion Nat. Bank, 169 U. S. 416, 18 S. Ct. 390, 42 L. Ed. 801. With these rules governing, we come to the question of facts in each of the five lines upon which it is charged that excess loans in violation of the National Statute were made.

### The John Puls Line.

This account started about the year 1914 by an assumption on the part of John Puls of an indebtedness which his father owed the bank, arising out of a transaction in which John Puls bought his father's farm; and in the transaction assumed a liability then against and from his father to the bank of about $14,000. This amount was reduced from time to time until October 10, 1920, when it was reduced to $9,600. From this time until the closing of the bank, John Puls carried a checking account with the bank, practically always overdrawn, and from time to time would give his notes to the bank to cover overdrafts and in payment of loans made to him by the bank. And he would also on occasions take up the notes due and place them in notes of larger denominations, covering loans previously made.

There was a transaction in 1919 wherein John Puls bought a farm from a party named Baltisberger and gave his note for $6,000 as a part of the purchase price. He sold this farm to his brother Elmer Puls, and took back as a part of the purchase price $12,000 second mortgage, and, as the court understands it, put up this $12,000 second mortgage to secure the $6,000 indebtedness which was then held by a third person.

Later, on February 5, 1923, to release this $6,000 indebtedness, so this bank, together with another Grinnell bank, could obtain the $12,000 second mortgage as security for the indebtedness of John Puls to the two banks, he gave his note to the Merchants' National Bank for $3,312.60, and a note for like amount to the other bank, and the two banks together paid off the $6,000 note and took over the $12,000 second mortgage as security for his debt. However, nothing was realized by this bank on the second mortgage, as the first mortgage was foreclosed on the land, and the bank did not see fit to redeem.

There was another transaction in which John Puls took up a note made by his brother-in-law and upon which he was surety, and gave his note therefor, and which was later included in renewal notes. These transactions are set out because the defendants claim that they did not constitute money borrowed from the bank, and should be deducted in considering the amount due the bank on borrowed money for which the defendants might be liable on an excess loan. However, the court is satisfied that all of these transactions were within the meaning of the statutes "money borrowed from the bank." The phrase "money borrowed" has been defined as follows: "A loan is made when the borrower receives money over which he exercises dominion, and which he expressly or impliedly promises to return." First Nat. Bank of Cordova v. Tjosevig, 138 Wash. 231, 238, 244 P. 736, 738; 9 C. J. 141.

However, the use of the term in the statute under consideration must bear a broader construction. If the term means cash loaned over the counter of the bank, it would not have been necessary for the Congress to have added the provisions that paper discounted by the bank, based on property with value, should not be considered as borrowed money; the inference plainly being that any rediscount purchased by the bank upon which a borrower was primarily liable must be considered as money borrowed within the meaning of the statute.

On February 5, 1923, occurred the transaction on which for the first time made the amounts due and owing from John Puls to the Merchants' National Bank in excess of $20,000. On that date, as shown by the duplicate deposit slip introduced in evidence, he executed new notes to the bank aggregating $24,000. This was a renewal of old notes aggregating $17,379.23, and the balance of $6,620.77 would constitute an excess loan under the statute for which any director knowingly participating in or assenting to would be liable.

In this same transaction was deducted the sum of $3,312, being the amount advanced by the Merchants' National Bank to John Puls to pay off one-half of the $6,000 note to enable the bank to have the $12,000 second mortgage for security, and the balance of $3,308.77 was placed to the credit of John Puls in his checking account on this date of February 5, 1923.

The court is unable from the evidence to determine who made this transaction. The deposit slip being signed "T. M. S.," it could not be one of the defendants in this case, and the evidence is silent as to who authorized or carried out this transaction. At any rate, on February 5, 1923, it clearly appeared on the books of the bank that John Puls had exceeded the amount which the bank could lawfully loan to him.

On February 27, 1923, an examination was made of the Merchants' National Bank by a national bank examiner, which was completed on March 1, 1923, and his report was before the board of directors, as shown by the testimony. That report shows a loan to John Puls and wife of $25,000, and the attention of the board of directors was by this report expressly directed to the fact that this loan exceeded the limit prescribed by section 5200 of the Revised Statutes, and by a notation on said report as follows: "The examiner should advise the directors of their individual liability under Section 5239 U. S. R. S. for all loss sustained on excessive or other unlawful loans."

Following this were letters from the Comptroller of the Currency to the board of directors, responded to by the cashier, with reference to this excess loan. Mr. Carney, the vice president of the bank, testifies that during this time the policy of the directors was to make additional loans to parties having excessive credits for specific purposes only, in order to finance them during the depression.

The situation then was called to the attention of the directors about March 1, 1923, and the fact brought home to them that this loan of $25,000 and all future loans would be in excess of the limit prescribed by the statute. So that, clearly, any loans made from and after that date must be responded to by the directors for the loss sustained to the bank by any such loans.

After this date and on April 19, 1923, the bank loaned John Puls an additional $1,120, evidenced by a note, but this was paid on July 10, 1923, when an additional loan was made to him of $2,250. And after deducting the $1,100 note with interest, there remained

a credit which was deposited to his checking account for the sum of $1,129.98.

On August 23, 1923, a further loan was made to him of $1,000; October 17, 1923, a further loan of $200; December 29, 1923, an additional loan of $2,000; and on July 19, 1924, an additional note was given to cover an overdraft of $3,500. All of these loans were for money borrowed from the bank, were approved by the board of directors, as shown by the minute book, placed in the checking account of John Puls and expended by him by personal checks given on the bank on this account. An overdraft of $140.85 at the time the bank closed was later paid to the receiver.

The directors are, therefore, personally liable to this plaintiff on each of said items, with interest thereon at the rate of 6 per cent. per annum from the date when the loans were so made. And judgment should be entered in favor of the plaintiff on this line as follows: $1,129.98 with 6 per cent. interest from July 10, 1923; $1,000 with 6 per cent. interest from August 23, 1923; $200 with interest at 6 per cent. from October 17, 1923; $2,000 with interest at 6 per cent. from December 29, 1923; $3,500 with interest at 6 per cent. from July 19, 1924—aggregating $10,234.98. Perhaps the court should add that it considers the liability as accruing at the time the loans were made under the authority of the Corsicana National Bank Case, herein cited, that such an excess loan is a tort, and hence the interest from the date of the transaction.

### McFate & Roberts Line.

This account is practically in the same situation as far as the manner of procuring the excess loans by the borrower is concerned. As early as November 1, 1922, the books of the bank show loans to this partnership and to the individual members thereof, aggregating $21,843.85. However, there was no report of the examiners that called attention of the board of directors to this excess loan prior to an examination which was made on January 30, 1924, although there was an examination and report to the board of directors in September, 1923, in which the attention of the directors was called to excess loans other than this loan which was not mentioned. As the national bank examiner did not discover that there were three accounts in this line which aggregated more than $20,000, the court does not feel that the directors should be charged with notice until February 2, 1924, when the examination that was started on January 30, 1924, by a national bank examiner, was completed.

On February 2, 1924, the amounts loaned on this line aggregated $23,825.60. On March 12, 1924, in answer to a letter from the Comptroller of the Currency to the board of directors of the Merchants' National Bank of Grinnell, the directors sent a letter to the Comptroller of the Currency stating that the excessive loans of McFate & Roberts amounting to $23,825.60 would be reduced. This statement was signed by all of the directors who are defendants in this case. Certainly, then, from and after March 12, 1924, the directors had knowedge of the excess loan in the McFate & Roberts line. And as loans were made after that date in cash to the partnership, it must be determined that the same were with the consent and approval of the board of directors.

Directors following out the policy of making specific loans only to excess borrowers, the following loans were made to Glenn Roberts, or to McFate & Roberts, after March 12, 1924; March 15, 1924, $150; April 8, 1924, $100; April 21, 1924, $140; May 5, 1924, $100; May 8, 1924, $100; May 19, 1924, $100; May 3, 1924, $262; June 16, 1924, $100; July 19, 1924, $150; August 4, 1924, $20; September 11, 1924, $60; October 15, 1924, $50—making a total of $1,332.

These amounts were all evidenced by note and were shown on the checking account of Glenn Roberts and paid out by him on his own check. The several amounts were therefore all lost to the bank, and plaintiff is entitled to recover the aggregate amount of these accounts with interest thereon at the rate of 6 per cent. per annum from October 15, 1924.

In addition to the above was a note executed by Glenn Roberts for the sum of $800, which was given to secure funds to pay John McKeag for interest on the first mortgage on the Glenn Roberts farm. This note was secured by a chattel mortgage upon which there was a recovery of $551.22, the balance of $248.70 being a liability of the defendant directors.

Plaintiff is therefore entitled to recover on this line as against the defendants and each of them in the sum of $1,332.00 with interest thereon at the rate of 6 per cent. per annum from the 15th day of October, 1924, and also $248.70 with interest thereon at the rate of 6 per cent. per annum from the 4th day of August, 1924; aggregating $2,006.22.

### J. E. Stewart and Louella Stewart Lines.

During the time of the matters here under investigation J. E. Stewart and his wife, Louella Stewart, owned jointly 160 acres of land, and Louella Stewart owned an

additional homestead 40 acres. J. E. Stewart also owned a 200-acre farm north of the home farm. J. E. Stewart farmed the lands and was engaged in the business of farming and stock-raising, and acquired an indebtedness at the Merchants' National Bank of Grinnell in July, 1922, of $17,911.12. On this date J. E. Stewart gave two notes aggregating $18,500, and his wife, Louella Stewart, gave the bank a note for $3,700. From this time on until the closing of the bank the liability of J. E. Stewart ran in the neighborhood of but slightly below $20,000, while any increased loans that were made were taken in the name and on the note and security of Louella Stewart.

It is claimed by the plaintiff that these accounts should be construed and considered as one line, and that the directors should be liable for at least the increased amount loaned to both J. E. Stewart and to his wife in excess of $20,000. The statute, however, does not include a liability for loans made separately to a husband and wife, and there is no claim that the business was conducted in partnership, and the individual loans, therefore, to J. E. Stewart and to Louella Stewart are not within the express provisions of the statute.

If we were here considering the question of negligence on the part of the directors, the fact that loans were made to husband and wife, in excess of the prescribed limit to one person, would be an element for serious consideration. But, as has been pointed out, the directors making these loans were at all times under the honest belief that the loans were safeguarded by ownership of real estate, and we are not here considering the question of negligence, but a question of liability under the express provisions of a statute.

The fact that these loans were made to individuals would not, even though made for the purpose of procuring the money for the use and benefit of one of the parties, make the loans a liability as against that person for whose use and benefit the money was procured. Loans to separate individuals both of the same family could not make of such individuals a firm or company, and to charge the loan as having been made in this case to J. E. Stewart would necessitate a showing on the part of the plaintiff that such loan was made by fraud, bad faith, or subterfuge, and having the force and effect of a loan made directly to J. E. Stewart.

However, in this case, there was no fraud or bad faith, or subterfuge, in permitting J. E. Stewart to borrow money on notes signed by his wife, as she owned real estate of a value far in excess of the amount of the loan, or at least it was so considered at the time the loans were made. Patrick v. Arkansas Nat. Bank, 292 S. W. 143, 148, sec. 4, 172 Ark. 1103.

The question of participation in or assenting to the making of an excess loan is not to be confused by any consideration of the supposed standing of the borrowers, personal or financial. Corsicana Nat. Bank v. Johnson, 251 U. S. 68, 94, 40 S. Ct. 82, 64 L. Ed. 141. And the court may consider the practical effect of the transaction. Corsicana Nat. Bank v. Johnson, supra, page 89 of 251 U. S. (40 S. Ct. 82).

It might perhaps be added that in this account also was a loan taken to a son, Ben Stewart, on June 25, 1923, for $1,968, but this represented the following items: Accrued interest on J. E. Stewart notes $1,472.12; accrued interest on Louella Stewart notes $339.41; and new money $156.47. The amount of new money herein involved on which the directors might be liable is too small to charge the directors with liability, even if it were for the use and benefit of J. E. Stewart and held in the name of Ben Stewart as a subterfuge for the liability of J. E. Stewart.

The court has carefully examined the evidence in this case, and has come to the conclusion that the separate loans to Louella Stewart were made by the bank in good faith and upon her security, and was not done as in the case of Gamble v. Brown, supra, merely as a nominal change of borrowers to an irresponsible person, where the money was in fact paid and due and owing by another party. It follows that that portion of plaintiff's petition claiming a liability, as against the directors, for the account of J. E. Stewart and wife, is dismissed on its merits.

M. E. Sturgeon and Sadie Sturgeon Lines.

The situation here is practically the same as in the Stewart lines. Sadie Sturgeon, the wife of M. E. Sturgeon, owned a large amount of real estate, and M. E. Sturgeon was in the farming and stock-raising business on the land, and, having become involved with the Merchants' National Bank, it took notes of Sadie Sturgeon, dividing the liabilities of M. E. Sturgeon, so that at no time did his account or that of his wife exceed the sum of $20,000.

For the reasons stated in the foregoing opinion in the Stewart line, the court does not find any liability as against the directors for these loans to M. E. Sturgeon and Sadie Sturgeon, and that part of the plaintiff's pe-

322

tition charging them with liability on the Sturgeon lines is dismissed on its merits.

### Ralph Sherman Line.

 Ralph Sherman was another successful farmer and stockraiser, with large holdings of real estate in Poweshiek county, Iowa. During the years 1920 to 1922 the Merchants' National Bank had sold some of his notes aggregating $7,000 to different parties, and on July 31, 1923, he was indebted to the bank in the sum of $20,000, evidenced by five promissory notes. And on that date, being pressed to give security for this loan, he gave a note to the Merchants' National Bank for $27,000 signed by himself and wife, and secured by second mortgage on their farm land. On the back of the note is the following notation in the hand writing of B. J. Carney, vice president and one of the directors of the bank: "This note carries nine notes as collateral amounting to $27,000 as follows: (setting out the amounts)."

The testimony of Mr. Carney, however, developed that this note and mortgage was given to the bank as a trustee to secure the $20,000 indebtedness then existing as against Ralph Sherman to the bank, and also $7,000 then held by private parties. Subsequent to this date the bank purchased one of these notes in the amount of $2,000 from J. C. Goodrich who was a director of the bank. The explanation of the purchase being that the bank had guaranteed its payment by indorsement, and the bank was compelled to take it upon their guaranty.

The bank, through its president, George H. Hamlin, also purchased one of these notes in the sum of $2,000 from one Fred Reisch, but there is no evidence that this note was indorsed by the bank when sold to Mr. Reisch, or that the bank was compelled to purchase it.

The only question of the Ralph Sherman account is as to the knowledge of the various directors of the liability of the bank at the time of the purchase of the Fred Reisch and J. C. Goodrich notes. There is no evidence that would bring home a knowledge to any of the directors that the note that had been sold to J. C. Goodrich was indorsed by the bank, or that this paper had been handled through the bank. Mr. Carney testified that he had no knowledge of the transaction, but was compelled to take up the Goodrich note on account of the bank's guaranty. The only question on this account is as to the knowledge of the various directors of the liability of the bank upon the Fred Reisch and J. C. Goodrich notes; the Fred Reisch note was taken up by the president, George H. Hamlin. It contained no direct indorsement of the bank. Each of the directors, including Mr. Carney, denied knowledge of any liability of the bank on this Fred Reisch note or on the J. C. Goodrich note. The evidence fails to bring home a knowledge of this indirect line of credit of Sherman to any one other than George H. Hamlin. While there are a number of circumstances which might have put the directors on inquiry, such as the payment of interest and the taking of the $27,000 note and mortgage, yet these circumstances could all be explained on the theory that the bank was simply looking after the interest of its customers.

The bank examiner at no time discovered or reported any excess loan in this line that might impart notice to the directors. The court, therefore, finds no liability on this line as against any of the directors except as to the purchase of the Fred Reisch note by Mr. George H. Hamlin at a time when the bank already held $20,000 of Mr. Sherman's paper. Judgment will therefore be entered against George H. Hamlin, only, for an additional $2,074.04 on the Fred Reisch transaction, with 6 per cent. interest from July 20, 1924, aggregating $2,658.65.

It is therefore ordered that the plaintiff recover as against each and all of the defendants the sum of $12,241.20 as herein adjudicated, and, in addition thereto, an additional sum of $2,658.65 against the defendant George H. Hamlin. All parties except.