**PAYNE v. OSTRUS et al.**

No. 8871.

Circuit Court of Appeals, Eighth Circuit.

June 5, 1931.

Harry B. Swan, of Atlantic, Iowa (Swan, Martin & Martin, of Atlantic, Iowa, on the brief), for appellant.

Addison G. Kistle, of Council Bluffs, Iowa (George S. Wright, of Council Bluffs, Iowa, and Russell E. Ostrus, of Des Moines, Iowa, on the brief), for appellees.

Before KENYON and VAN VALKENBURGH, Circuit Judges, and DAVIS, District Judge.

VAN VALKENBURGH, Circuit Judge.

This is a suit in equity by the receiver of the First National Bank of Cumberland, Iowa, against T. E. Ostrus, C. E. Studley, O. E. Ostrus, E. E. Wollenhaupt, and G. E. Wollenhaupt, directors of said bank. The bank closed its doors June 30, 1926. The bill of complaint is divided into three divisions, each division being subdivided into several counts, and each count into a number of paragraphs. Described generally, division 1 bases the liability of the directors upon their acts in making or approving excessive loans. This charge is thus stated: "That during the time said defendants were directors of said First National Bank of Cumberland, Iowa, and while they were in the active management of said banking association they and each of them knowingly permitted and approved loans to be made by their officers and agents in excess of 10% of their capital and surplus, and by reason of their knowing participation in and consent to such excessive loans, contrary to the United States Revised Statutes, paragraphs 5,200 and 5,239, said defendants and directors are severally liable for the items and amounts hereinafter set forth, which damage is the property of the Receiver for the benefit of the creditors, and no part of which has been paid."

Division 2 is in five counts. Count 1 seeks to hold the defendants for alleged negligence in failing to enforce the claimed liability of former directors, including T. E. Ostrus, O. E. Ostrus, and Studley, for damages resulting from excess loans made while they were directors, and for allowing the statute of limitations to bar recovery against such named directors. Count 2 also charges defendants themselves with losses resulting from excess loans made prior to April 30, 1919. Count 3 charges appellee E. E. Wollenhaupt, in violation of his oath, with failure to attend directors' meetings at which excess loans were approved. Count 4 charges negligence with respect to what is designated the Mueller farm mortgage transaction, and count 5 relates in like manner to what may be termed the Trego farm mortgage transaction. Division 3, in eight counts, charges that the directors violated section 5239, Rev. St. U. S. (12 USCA § 93), by renewing loans, which became excessive, by reason of the fact that, pending the term of the original loan, the bank's surplus had been reduced, thereby automatically reducing the loan limit. The court found the issues for appellees and dismissed the bill.

The causes of action embraced in divisions 1 and 3 fall concededly within the terms of section 5200, Rev. St. U. S., 12 USCA § 84, which, so far as pertinent, reads thus: "The total liabilities to any association of any person or of any company, corporation, or firm for money borrowed, including in the liabilities of a company or firm the liabilities of the several members thereof, shall at no time exceed 10 per centum of the amount of the capital stock of such association, actually paid in and unimpaired, and 10 per centum of its unimpaired surplus fund: Provided, however, That * * * the discount of commercial or business paper actually owned by the person, company, corporation, or firm negotiating the same * * * shall not be considered as money borrowed within the meaning of this section."

It is further well established that the liability of a director of a National Banking Corporation is defined by section 5239, Rev. St. U. S., 12 USCA § 93, as follows: "If the directors of any national banking association shall knowingly violate, or knowingly permit any of the officers, agents, or servants of the association to violate any of the pro-

visions of this chapter, all the rights, privileges, and franchises of the association shall be thereby forfeited. Such violation shall, however, be determined and adjudged by a proper district, or Territorial court of the United States, in a suit brought for that purpose by the Comptroller of the Currency, in his own name, before the association shall be declared dissolved. And in cases of such violation, every director who participated in or assented to the same shall be held liable in his personal and individual capacity for all damages which the association, its shareholders, or any other person, shall have sustained in consequence of such violation."

This section affords "the exclusive rule by which to measure the right to recover damages from directors based upon a loss alleged to have resulted solely from violation by such directors of a duty expressly imposed upon them by a provision of the National Banking Act." McCormick v. King (C. C. A. 9) 241 F. 737, 743, affirmed 250 U. S. 504, 39 S. Ct. 549, 63 L. Ed. 1113; Yates v. Jones National Bank, 206 U. S. 158, 177, 27 S. Ct. 638, 51 L. Ed. 1002. That, to impose liability upon the director, the act in violation must be intentional as distinguished from one of mere negligence, is thus stated by the Supreme Court in Corsicana Nat. Bank v. Johnson, 251 U. S. 68, 72, 73, 40 S. Ct. 82, 84, 64 L. Ed. 141: "Under the rule settled by familiar decisions of this court, in order for the bank to prevail in this action it must appear not only that the liabilities of a person, company, firm, etc., to the bank for money borrowed were permitted to exceed the prescribed limit, but that defendant, while a director, participated in or assented to the excessive loan or loans, not through mere negligence, but knowingly and in effect intentionally (Yates v. Jones National Bank, 206 U. S. 158, 180, 27 S. Ct. 638, 51 L. Ed. 1002), with this qualification, that if he deliberately refrained from investigating that which it was his duty to investigate, any resulting violation of the statute must be regarded as 'in effect intentional' (Thomas v. Taylor, 224 U. S. 73, 82, 32 S. Ct. 403, 56 L. Ed. 673; Jones National Bank v. Yates, 240 U. S. 541, 555, 36 S. Ct. 429, 60 L. Ed. 788)."

So far as the personal liability of the director is concerned, it is limited to loss or damage sustained by the bank as a result of the violation. Such loss or damage must be shown before recovery can be permitted.

We turn our attention first to the violations charged under division 3 of the bill of complaint. As has been said, these alleged violations consisted of the renewal of loans that had become excessive by reason of the fact that the bank's surplus had been reduced, thus reducing the loan limit. In the absence of exceptional circumstances and a course of conduct pointing unavoidably to a deliberate purpose to evade the law and to extend unwarranted lines of credit, we do not think the taking of renewal notes falls within the inhibition of the letter and spirit of the statute. No new money leaves the bank's vaults. None of the conditions which attend the making of the original notes are present. To bring these acts of directors within the purview of the statute prohibiting excess loans, the court must look beyond the mere act of renewal in any particular case "to find out what was the real and true transaction." McRoberts v. Spaulding (D. C.) 32 F. (2d) 315, 318; Curtis v. Metcalf (D. C.) 265 F. 293, 296. In Coffin v. United States, 162 U. S. 664, 677, 16 S. Ct. 943, 948, 40 L. Ed. 1109, it is held that, "if the money of a bank be misapplied by paying it out on worthless paper, it is obvious that a subsequent renewal of such paper upon which nothing was actually obtained could not have misapplied the money of the bank." So if a note be worthless when made, or become so before maturity, a renewal, in which the bank parts with no money, and upon which nothing is added but accrued interest, "would not amount to a new loan for borrowed money." McRoberts v. Spaulding supra. This likewise disposes of the same contention respecting the interest notes taken on renewal. It does not appear that the bank was damaged by the taking of these renewal and interest notes, nor is it shown that the original notes were collectible or that the interest could have been paid by the makers. Furthermore, the best interests of banks often demand that notes should be renewed, and that, on occasion, collections should not be pressed. It may be that to continue the operations of the bank at this time, and to pay operating expenses, was bad policy from a business standpoint, but that is a consideration not within the issues of this action.

A number of the charges in division No. 1 of the bill of complaint involve alleged excess loans in the form of renewals with accompanying interest notes. To such the foregoing remarks equally apply. But with respect to both divisions, 1 and 3, we find it unnecessary to go further deeply into the merits. In division 1 there are charges of the making and approval of excess loans oth-

er than by acceptance of renewals and notes for interest upon original loans. To such charges, while appellees stoutly challenge their merit, the defense of limitation is interposed. The court in finding for appellees, as appears from the record, was governed largely by its views respecting the application of the Iowa statutes of limitation. This case is governed by the applicable limitation statutes of that state. Curtis v. Connly, 257 U. S. 260, 42 S. Ct. 100, 66 L. Ed. 222; McClaine v. Rankin, 197 U. S. 154, 158, 25 S. Ct. 410, 49 L. Ed. 702, 3 Ann. Cas. 500.

It is conceded that the application of the Iowa statutes must be confined to the following paragraphs of section 11007 (Iowa Code 1924):

"3. Injuries to person or reputation—relative rights—statute penalty—setting aside will. Those founded on injuries to the person or reputation, including injuries to relative rights, whether based on contract or tort, or for a statute penalty, within two years.
* * *

"5. Unwritten contracts—injuries to property—fraud—other actions. Those founded on unwritten contracts, those brought for injuries to property, or for relief on the ground of fraud in cases heretofore solely cognizable in a court of chancery, and all other actions not otherwise provided for in this respect, within five years."

■ Since directors of a national bank are not trustees of an express trust, but of an implied and resulting trust created by operation of law, statutes of limitation apply and may be invoked by them. Cooper v. Hill (C. C. A. 8) 94 F. 582.

■ The trial court at one time expressed itself as satisfied that the two-year limitation applied, and such seems to be the understanding of counsel respecting the court's attitude. The record is not entirely satisfactory upon this point; but, in any event, we are of opinion that this case does not fall within the two-year limitation period. The cause of action is not founded upon injuries to person or reputation as those terms are commonly understood; and "the plain, obvious and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover." Lynch v. Alworth-Stephens Co. (C. C. A.) 294 F. 190, 194. By this same test we must reject the suggestion that relative rights are involved. We think the nature of such rights is very satisfactorily stated by the Supreme Court of Iowa in Chase v. City of Winterset, 203 Iowa, 1361, 214 N. W. 591, 592: "We need not attempt a comprehensive definition of relative rights, but they include such as may arise out of the relationship of husband and wife, master and servant, guardian and ward, and similar relationships."

■ Of course if substantial doubt exists, the longer, rather than the shorter, period of limitation is to be preferred. Hughes v. Reed (C. C. A. 10) 46 F.(2d) 435, 440. On behalf of appellant it is strongly urged that "from January 13, 1920, there was never a time but when three of the five directors, who were directors of the bank when it closed, were members of the board, and had control of said bank"; that a majority of the board is sufficient to constitute such control; and that, for this reason, no statute of limitations has run. The following cases would seem, at first thought, to support this statement of the law: Rankin v. Cooper (C. C. Ark.) 149 F. 1010, 1015; Cockrill v. Abeles (C. C. A. 8) 86 F. 505, 512; Schilling v. Parman (D. C. Or.) 35 F.(2d) 780; Adams v. Clarke (C. C. A. 9) 22 F.(2d) 957, 959; National Bank of Commerce v. Wade (C. C. Wash.) 84 F. 10, 15.

In general it may be said that in practically all of these cases the decision was based upon the conception of a full, complete and exclusive control in the directors or officers charged. In Cockrill v. Abeles, supra (this court), the following significant statement is found: "Moreover, the complaint alleges, in substance, that at the time of the commission of the wrongful acts in question, and afterwards, until the appointment of a receiver, the defendants who were concerned therein constituted a majority of the directors, and that, in consequence of their having full control of the corporation, no suit could be brought to redress the alleged grievance, until a receiver was appointed. In view of these considerations, and because all the transactions relating to the increase of the stock must be fully investigated in the further progress of the case, it is deemed both unnecessary and inexpedient to express a decisive opinion upon the point last suggested."

Of course, where fraud, concealment, or unusual conditions or extraordinary circumstances exist, the chancellor, in a suit of this nature, will not be bound by the statute, but "will determine the extraordinary case in accordance with the equities which condition it." Cooper v. Hill (C. C. A. 8) 94 F. 582, 591. The Supreme Court speaking to the point now under consideration has held:

"The running of a statute of limitations on a cause of action of a bank against directors will not be suspended by its fraudulent concealment beyond a period in which new directors, performing their duty to learn the bank's affairs, would presumably have discovered it." In the body of the opinion it is said: "Knowledge of the facts by the new directors was knowledge by the bank, and none the less that according to the bill they in their turn were unfaithful. It is not alleged that they conspired with the defendants whose case we are considering. They came to the board as the eyes of the bank. Any one of them having notice was bound to do what he could to avert or diminish the loss. Indeed the bill seeks to charge one of them for not having done his duty. Notice to an officer, in the line of his duty, was notice to the bank. A single director like a single stockholder could proceed in the courts. * * * The statute of limitations must not be applied so narrowly that business men will be afraid to take directorships." Curtis v. Connly, 257 U. S. 260, 264, 42 S. Ct. 100, 101, 66 L. Ed. 222. See, also, Cooper v. Hill, supra.

In Anderson v. Gailey, 33 F.(2d) 589, 592, Judge Sibley of the District Court for the Northern District of Georgia, in a very able opinion, reviewing many applicable decisions, including Curtis v. Connly, supra, concludes that:

"It cannot be said generally that a director has no protection by the statute of limitations so long as he continues in office. * * *

"Whether the conduct of the majority is wise and diligent under all the circumstances, or wrongful, is often a close question, and controversy over it needs the quieting of limitation as much as any other controversy. Without it business men would hesitate to become bank directors. Adams v. Clarke (C. C. A.) 22 F.(2d) 957, involved the entire board. I do not think the rule can be established that no limitation begins to run so long as the majority continue in control, provided there is no fraudulent concealment of the cause of action, and provided the cause of action is not itself a fraud. Curtis v. Connly, 257 U. S. 260, 42 S. Ct. 100, 66 L. Ed. 222."

 The cause of action for liability of a national bank director under section 5239, Rev. St. U. S. (12 USCA § 93), is complete when the excess loan is made. Corsicana National Bank v. Johnson, 251 U. S. 68, 86, 40 S. Ct. 82, 64 L. Ed. 141; Adams v. Clarke (C. C. A. 9) 22 F.(2d) 957, 959. The fiduciary relation between a bank and its directors ceases when they leave the board. Curtis v. Connly, 257 U. S. 260, 262, 42 S. Ct. 100, 66 L. Ed. 222. Appellee Studley became a director October 7, 1918. He resigned July 6, 1921, and was succeeded by one Patrick, a nondefendant. He came to the board again November 19, 1923. From July 6, 1921, to July 13, 1921, the board of directors consisted of T. E. and O. E. Ostrus, defendants, and appellees herein, and Becker, Bell, and Patrick, nondefendants. Appellee George E. Wollenhaupt became a director July 13, 1921, and E. E. Wollenhaupt, on November 19, 1923.

 Neither fraud, concealment, nor other unusual conditions or extraordinary circumstances attending the operations of the bank during the periods under examination, are charged or shown. Under the facts above recited, and the rules announced in Curtis v. Connly, Corsicana National Bank v. Johnson, Cooper v. Hill, Anderson v. Gailey, and other cases herein cited, the five-year Iowa statute of limitations began to run against appellees Studley, T. E. Ostrus, and O. E. Ostrus, July 6, 1921, for all violations, if any, committed prior to that date. Of course, appellees George E. Wollenhaupt and E. E. Wollenhaupt were not members of the board until later, and could not have participated in any happenings prior to the last-named date. This suit was filed April 17, 1928, nearly seven years later. Since July 6, 1921, a careful analysis of the evidence discloses but one transaction in which an excess loan resulted, as follows: August 23, 1923, one E. L. Cannon owed the bank $4,400. The loan limit at that time was $4,500. On that date he executed his note for $155, which sum was credited to his checking account. At that time appellees Studley and E. E. Wollenhaupt were not members of the board. The loans to Cannon would thus appear to have been excessive by $55. November 17, 1923, $120 of this last loan was repaid, leaving a net excess of $35 remaining. It is apparent that this small excess over the loan limit was inadvertent rather than intentional, and we do not, therefore, regard it as a substantial violation of the provisions of section 5200 (12 USCA § 84), as construed by the Supreme Court.

 What is known as the Mueller mortgage transaction is charged in division 1 as in violation of the excess loan provision of section 5200 (12 USCA § 84). A brief explanation of the nature of this transaction is deemed appropriate, if not necessary, in this connection. January 13, 1921, A. W. Mueller gave

to the bank a mortgage upon his farm, consisting of 160 acres, to secure an existing indebtedness of about $7,608.24. There was then upon the land a first mortgage of $14,000, and a second mortgage of $7,000. It became necessary to foreclose the bank's mortgage, and a decree was entered November 23, 1921. January 23, 1922, the bank became the purchaser at sheriff's sale. The second mortgage and note secured thereby were made and executed by one A. W. Mueller. This note fell due May 1, 1925, and to protect its interest in the land, the bank paid the assignees of the second mortgage $6,758.33, and procured an assignment thereof, and of the note secured thereby. Upon the advice of bank examiners the bank carried this transaction upon its books in the "Bills Receivable Account" as a $7,000 note of A. W. Mueller. It transpires that it should have been carried more properly as "other real estate," having to do with real estate taken in collection of a debt. In any view, that transaction did not constitute an excess loan within the meaning of section 5200 (12 USCA § 84).

■■■ Division 2 of the bill of complaint charges appellee directors with common-law negligence, in violation of their duty to exercise due care in the management of the bank. The exclusive application of section 5239 with respect to violations of the National Banking Act (section 5200) does not prevent an action under the common-law rule for measuring violations of common-law duties. Bowerman v. Hamner, 250 U. S. 504, 511, 39 S. Ct. 549, 63 L. Ed. 1113. This division contains five counts. We take them up in inverse order. The fifth count has to do with a transaction which may be described as the Trego mortgage deal. It appears that, November 12, 1921, the First National Bank of Cumberland instituted an action in foreclosure of a mortgage it held against the 160-acre farm of one Roy Trego to secure an indebtedness approximating $8,000, subject, however, to a prior mortgage of $24,000 upon the same land. November 30, 1921, the bank accepted a warranty deed from Trego and wife in full settlement of its mortgage claim. Subsequent foreclosure of the first mortgage resulted in loss to the bank and to the receivership, and the taking over and carrying the Trego farm in the assets of the bank, with the expenditures incidental thereto, is charged as negligence. It appears that, of the total of $10,120.12, alleged to be involved in this transaction, $5,645.80 in the way of rentals and cash payments were re-

covered. The second count of this second division charges like negligence with respect to the Mueller transaction, the facts concerning which have been stated hereinabove. It conclusively appears from the agreed statement of facts that the steps taken in both these matters were deemed necessary and advisable to protect the interests of the bank, and as an effort to collect indebtedness due the bank. In such cases large discretion is lodged in managing officers and directors. Mere error of judgment and resulting loss is not sufficient to support a charge of negligence. In both cases the charges against the lands, including the claims of the First National Bank of Cumberland, did not exceed $200 per acre. We do not think an attempt to collect upon the basis of such a valuation is necessarily evidence of negligence or improvidence. The same may be said of loans made to Iowa farmers during the period under consideration. The situation in Iowa at that time is so well described by Judge Dewey in McRoberts v. Spaulding (D. C.) 32 F.(2d) 315, 316, 317, that we quote liberally from his opinion:

"The evidence shows, and the court will take judicial notice of, the banking situation, and the method and manner of its conduct prior to the deflation period, which started about the year 1920. The surety for country banks in Iowa and the basis of credit is real estate. From the time of the Civil War up to the year 1920, real estate in Iowa had a standard and fixed valuation, increasing gradually, and a person engaged in farming in Iowa prior to 1920, if honest and industrious, was worthy of credit. And the banks in Iowa generally loaned such individuals money or extended them credit, based upon the amount of property which they owned; and if the borrowers had real estate, upon the amount or equity in the real estate owned by such individual borrower. * * *

"In retrospection it is easy to criticize the actions of the officers of the two or three hundred banks in Iowa that failed, with being derelict in their duties and making improvident loans, and yet, during all of the period in which it is charged that these defendants were negligent in making loans to individuals that were insolvent, the banking department of the state of Iowa was encouraging banks to remain open, having their directors sign guaranties of bank loans, and using every effort to maintain the former business relations, in the hope and expectation that such values would again become sound and substantial, and thus prevent the

closing of banks with resultant loss to stockholders and creditors."

Error is assigned to the alleged refusal of the court to allow appellant to show the market value of the real estate involved in the Mueller and Trego transactions. No real offer of such evidence was made. At or near the close of the testimony the court said: "Is there anything else upon this disputed question?" Mr. Swan (for appellant): "Not unless Your Honor wants to hear as to what the value of the real estate was, as to that time." The Court: "I don't think it makes any difference that I can now see." To this ruling, if it be one, no exception was taken.

■ Count 3, division 2, charges negligence on the part of Director E. E. Wollenhaupt in failing to attend directors' meetings, as a result of which certain excess loans were made and approved. This charge, however, has not been urged in assignment, argument, or brief, and has therefore been abandoned.

Counts 1 and 2 of division 2 charge negligence against appellees for failure to bring an action against themselves, or any other persons named as directors, for the making of excess loans in violation of section 5200 (12 USCA § 84), especially during the period from 1917 to 1920. Conceding, without deciding, that the failure to bring the suits indicated amounted to a breach of duty on the part of appellees, it is to be noted that counsel for appellant were somewhat doubtful of the practical value to the bank of such actions as is evidenced by paragraph VII of count 2 of division 2, to wit: "That said C. E. Studley, one of the defendants herein, is of doubtful financial ability and is not financially responsible to the amount of the excess loans referred to in this count, and that the other defendants herein may be found by the court, after a hearing upon the merits of said case, to not have knowingly violated section 5200 of the U. S. Revised Statutes with reference to the excess lines set forth in this count."

The record is barren of any tangible evidence that recovery could have been realized from suits of the nature specified in counts 1 and 2, except that it is incidentally shown that Lewis J. Groves, a former director, who resigned September 19, 1919, died November 28, 1925, leaving a personal estate of $33,-461.52. Whether it would have been of advantage to the bank to institute proceedings of this nature is not made clear by the evidence. The policy of the bank is indicated by the following action on the part of certain of its stockholders:

" 'Farmer's Savings Bank, Atlantic, Iowa'

"Dated Cumberland, Iowa, October 19, 1921.

"To Whom It May Concern: In view of the existing conditions in the First National Bank of Cumberland, Iowa, we, the undersigned stockholders, who hold all of the stock of the bank, except that part held by the directors, sanctions the action of the Board of Directors, in charging certain losses of the bank, incurred on former excessive loans, aggregating $7,836.98, to the undivided profits account, and willingly accept our part of the loss incurred thereby.

"[Signed] F. L. Butzloff,
 Atlantic, Iowa, 25 shares,
 J. A. Nelson,
 Atlantic, Iowa, 35 shares,
 Mrs. Alice Trainer,
 Atlantic, Iowa, 5 shares,
 Harold Ostrus,
 Wiota, Iowa, 10 shares,
 Wm. Waters,
 Wiota, Iowa, 10 shares,
 Hillary H. Studley,
 Cumberland, Iowa, 30 shares."

"The degree of care required of directors of a national bank depends upon the subject to which it is to be applied, and each case is to be determined in view of all the circumstances." Bates v. Dresser, 251 U. S. 524, 40 S. Ct. 247, 64 L. Ed. 388.

■ The chancellor evidently found that appellees were not negligent in the respect charged, and the record furnishes no ground for setting aside this finding By amendment to the bill of complaint, appellant made an additional charge against appellees T. E. Ostrus, O. E. Ostrus, and George E. Wollenhaupt of $8,000 based upon the following facts: February 8, 1922, these appellees, with Director Patrick, made their own note for $4,000 and credited it to undivided profits account, in order to charge off a worthless note of one Rogue for the same amount. May 22, 1922, the board of directors, by Wollenhaupt, made a note for $12,500, credited in the same way, and the $4,000 note was charged out. As his part of this obligation, J. W. Reihman, as director and president of the bank, gave notes in the sum of $4,000 which he failed to pay. It is evident that the original director's note of $4,000 was merged in the later note for $12,500. The record shows that, in 1922 and 1923, appellees and their associates paid into the bank approximately $40,000, an amount greatly in excess of the obligations upon which recovery is sought by this amendment. This claim of

appellant appears highly technical, if, indeed, it is not lacking in substance.

All things considered, we find no substantial ground for reversing the findings of the chancellor, and the decree is accordingly affirmed.