## HOLYOKE WATER POWER CO. v. AMERICAN WRITING PAPER CO., Inc.

### No. 2851.

Circuit Court of Appeals, First Circuit.

Dec. 15, 1933.

Bentley Warren, of Boston, Mass., Nathan P. Avery, of Holyoke, Mass., and Howard Stockton, Jr., of Boston, Mass. (Avery, Gaylord & Button, of Holyoke, Mass., and Warren, Garfield, Whiteside & Lamson, of Boston, Mass., on the brief), for appellant.

John L. Hall and Charles P. Curtis, Jr., both of Boston, Mass. (Russell L. Davenport, of Holyoke, Mass., on the brief), for appellee.

Before WILSON, MORTON, and LETTS, Circuit Judges.

WILSON, Circuit Judge.

This is an appeal from a judgment of the District Court of Massachusetts in an action at law to recover a sum alleged to be due as rental under a perpetual lease of a water power privilege on the Connecticut river at Holyoke, Mass.; trial by jury being waived.

The facts out of which the controversy arose are, as briefly as they may be stated, substantially as follows:

In 1859 the plaintiff acquired the water power privileges on the Connecticut river at Holyoke, consisting of a dam and three levels of canals, which it divided up into eighty or more units of sixteen-hour mill power, determined by a certain head and number of cubic feet per second flow. Of these, twenty-seven were sold under indentures to the predecessors in title of the defendant. The provision for rental in fourteen of these indentures is the subject of construction in this action.

The sales were all made upon proposals prepared in 1859, and the indentures were executed between the years 1859 and 1882. They were originally issued to several grantees, and came into the possession of the American Writing Paper Company prior to

1900, and in 1927 were acquired by the defendant from the receiver of the American Writing Paper Company.

The proposals of sale provided that each mill power, with the land to which it is annexed, shall forever be subject to a perpetual rent of at least "two hundred and sixty ounces troy weight of silver of the present standard fineness of the silver coin of the United States, or an equivalent in gold at the option of the grantee at the time of payment."

The proposals further provided that the terms and conditions therein contained might be varied as the parties might agree in the deed.

Only one indenture, between the plaintiff and the Albion Paper Company, a predecessor in title of the defendant, executed in 1877, is printed in the record; but it is agreed that it is typical of the other grants with respect to the provision for the payment of the rental.

The indenture between the plaintiff and the Albion Paper Company provided that the premises were granted "subject to the agreements, terms, conditions and all other matters and things in said annexed proposals set forth as obligatory upon the grantees, their heirs, successors and assigns, or their estates, and among other things yielding and paying to said Holyoke Water Power Company and their assigns forever, for each mill power above granted, the yearly rent of two hundred and sixty ounces troy weight of silver of the standard value and fineness of the silver coin of the United States coinage of the year one thousand eight hundred and fifty-nine, or its equivalent in gold."

It is to be noted that the only change in the form of payment as set forth in the indenture from that contained in the proposals is by inserting the word "value" after the word "standard," and the issue in this case is whether this affects the form in which the payment is to be made, whether in bullion or in currency.

In 1859, when the proposals were drawn, 260 ounces of silver; 90 per cent. fine, were worth at the United States Mint $302.50, or, to be exact, $302.495. Owing to the discovery and mining of gold in 1849, and in the 50's, silver, until 1877, notwithstanding the "crime of 1873," was the more stable metal measured by the market price, and contracts were frequently written payable in silver in the same manner as bonds are now written payable in gold. After 1877, however, silver bullion depreciated rapidly, until in 1900 260 ounces were worth approximately only $140.

It is admitted that from the date of the execution of the several indentures here involved until 1900 it was customary for payment to be made for each water power unit at the rate of $300 and in lawful currency, which, up to the issuance of greenbacks during the Civil War, was either coined silver or gold, except that in one instance, from 1881 to 1901, one of the lessees, the Hadley Company, paid, and the plaintiff accepted, silver bullion in payment of the rental. In 1901 the Hadley Company released its right to pay in bullion and agreed thereafter to pay in currency.

The plaintiff in its declaration relies on the custom existing up to 1900 of paying the sum of $300 in currency for each unit of sixteen-hour power, as constituting a modification of the original indentures. The District Court, however, found that this was not established by the evidence, and the plaintiff admits that this issue is not now open to it in this court.

It contended at the trial, though not relied on in its declaration, that, even if such modification were not proven, since the word "value" was inserted in the indenture after the word "standard," it must be given some effect; and, as the only form in which 260 ounces of silver can have the value of the coinage of 1859 is in the form of silver coinage, the payments must now be made in silver coin or its equivalent in gold.

Because in 1930 the only form in which 260 ounces of silver could be of the value of the coinage of 1859 was in the form of coin of the standard fineness of silver coins of that date, it does not follow that, in case at any time the price of silver bullion depreciated in terms of currency, the parties to these indentures intended that the rentals should be paid in silver coins. If the parties had so intended, they would have said so. 260 ounces of silver by weight does not ordinarily convey the idea of silver coins.

The parties in the first instance, by the terms used, clearly stipulated silver as a commodity in payment of the rental, as in Lilley et al. v. Fifty Associates, 101 Mass. 432; and then undertook to fix permanently the value of the commodity measured in whatever currency might be in use in the future, by assigning to it certain qualities of the silver coinage in a particular year. Experience has proved it cannot be done.

The District Court held that the language of the indenture and proposals, taken together, was not susceptible of the construction urged by the plaintiff, and, as the meaning of

the language was doubtful and uncertain, received evidence to enable him to determine what the intent of the parties was.

One of the plaintiff's assignments of error was the exclusion of evidence, offered by the plaintiff, of an expert in economics as to the intent of the parties.

Intent is not a subject for expert opinion, at least, when it is the ultimate issue in the case. Many times a judge would be glad if the intent of the parties to a written contract could be determined by experts in psychology, or economics, or rhetoric.

The evidence of the expert, therefore, as to the intent of the parties to these indentures from the language employed, was properly excluded; but, in case uncertainty or doubt as to the meaning of the language in a written instrument is found to exist, any facts from which the fact-finding tribunal can determine the intent of the parties to the contract is properly admitted and may be the subject of expert testimony. We think the rulings of the District Court properly restricted the evidence of the expert within this limit.

Significant evidence, however, of the understanding of the parties as to the proper construction of the paragraph providing for payment of rental was introduced by the defendant without objection; and, even though some of it might have been excluded if objected to, having been admitted without objection, it may properly be considered as bearing on what the parties, and especially the plaintiff, have always understood this controversial provision to mean. Gethins v. Breeyear, 252 Mass. 326, 147 N. E. 876.

In 1864 the board of directors of the plaintiff corporation adopted the following vote:

"Voted: That until otherwise ordered by the Holyoke Water Power Company or by their Board of Directors, the president be and he hereby is authorized to accept lawful currency in lieu and in full of rents of mill powers instead of requiring such rents to be paid in ounces of silver, provided that such currency is to be received in lieu of the silver stipulated in the indentures granting such mill powers, upon the mutual understanding of the parties that the same is received and accepted without in any manner waiving, changing, or impairing the right of said company to claim and receive in silver any rents of mill powers thereafter accruing and becoming payable in accordance with the terms

specified in the respective indentures granting such mill powers.

"With a view of executing the foregoing vote and giving full expression to the wishes of the directors, it was voted: That the following form of receipt be used in the settlement of all future water rents until otherwise ordered."

The form of receipt therein referred to as following is the same form as that given to the Farr Alpaca Company on January 1, 1879, which was as follows:

"$450.— Holyoke, Mass., January 1st, 1879

"Received of Farr Alpaca Co. Four Hundred Fifty Dollars in lieu and in full for Six Month's Rent of 3 Mill Powers, to January 1, 1879, without waiving, changing, or in any manner impairing the Right of the Holyoke Water Power Company, at a future time, to claim and receive in Silver any Rents of Mill Powers, hereafter accruing and becoming payable from said Farr Alpaca Co. in accordance with the terms of Rent specified in the Indenture granting said Mill Powers.

"Received Payment for the Co.

"W. A. Chase, Treas."

This form of receipt was used until 1887, when the above vote of the board of directors of the plaintiff was rescinded by a vote of February 2, 1887, and that the form of receipt used thereafter until 1903 was as follows:

"Holyoke, Mass., July 1, 1887.
"Farr Alpaca Company to Holyoke Water Power Company, Dr.
"To six months rent of six day and no night mill powers of water to July 1, 1887, ..............$900
"Received payment,
"Holyoke Water Power Company,
"Per J. S. Appleton."

Evidence that the Hadley Company paid in bullion from 1881 until 1901, when it gave up the right to pay in bullion and agreed to pay thereafter in currency, was also admitted without objection.

When in 1900 silver bullion had depreciated so that 260 ounces of silver, 90 per cent. fine, was worth approximately only $140, instead of $302.50 as in 1859, the plaintiff evidently realized the losses it would suffer in purchasing power if its grantees or their assigns insisted on paying the rental in bullion, and proceeded to procure releases of the right to pay in bullion under the terms of the indentures and from all its tenants except the American Writing Paper Company, and agreements to thereafter pay the rentals in

currency at the rate of $300 per unit of water power.

The defendant also offered without objection a record of a vote of the plaintiff's board of directors on September 12, 1901:

"On motion, it was voted: That the executive officers be, and they hereby are, authorized to purchase of the Chemical Paper Company that certain tract of land situated in said Holyoke * * * provided, first that said Chemical Company shall pay all past rentals for the use of water up to September 1, 1901, with interest thereon from and after July 1, 1901; secondly, that said Chemical Paper Company and the Holyoke Savings Bank shall release the right to pay the rental accruing after September 1, 1901, on the sixteen 24-hour mill powers held by said company in ounces of silver or their equivalent in gold; and said Chemical Company shall agree to pay hereafter all such rentals in United States currency at the yearly rate of $450 for each of said mill powers."

The following appears in the records of June 10, 1903:

"The President reported that an indenture had been executed between this company and William Skinner Manufacturing Company changing rental from ounces of silver to currency, defining hours during which water may be drawn, and stipulated damage clause; also that an indenture had been executed with George W. Prentiss changing rental from ounces of silver to currency, with stipulated damage clause and release of five feet in the width of the passageway along the upper level of the canal."

In the records of June 13, 1904:

"The President reported as to the following matters: That an indenture had been executed between this company and Emily J. Wilkinson changing rentals for four permanent sixteen-hour day mill powers on the third level canal from ounces of silver to currency."

In the records of June 18, 1908:

"On motion, it was voted: That the matter of leasing water to the Lyman Mills for other than power purposes be referred to the executive officers with power, provided only that as a consideration for such lease, the right to pay rentals in silver ounces shall be released."

The release obtained from the Whiting & Co. in February, 1932, after this action was begun, has peculiar significance, and reads as follows:

"Whereas it is the desire of the parties hereto, to set forth in writing and to agree to their construction always heretofore placed upon said indentures dated April 28, 1854, and September 25, 1869, and to their custom as to the payment and receipt of such rentals respectively, that $300 United States currency is to be paid and accepted as the equivalent of 260 ounces in silver, troy weight, for each of said fifteen 16-hour mill powers, and each of said six and one-half 16-hour mill powers, and $50 in United States currency as the equivalent of 43⅓ ounces in silver, troy weight, for the said one-third 8-hour mill powers.

"And the said Whiting & Company, Incorporated, hereby releases, surrenders and discharges to the said Holyoke Water Power Company and to its successors and assigns, any right which it may now or hereafter have under said indentures or any of them, to pay rentals which have accrued or may hereafter accrue, in ounces of silver or their equivalent in gold, or any right whatsoever to pay any rental under any of said indentures in any other manner than that which is hereinbefore agreed upon."

The defendant also offered correspondence between the plaintiff and the American Writing Paper Company in the year 1901 and 1902, indicating that terms had been agreed upon for a release by that company of its right to make payment in bullion and an agreement to pay thereafter in lawful currency the sum of $300 per unit of water power. In a proposal from the plaintiff to the American Writing Paper Company, the following appears:

"We will, however, recommend the sale to your company of a strip adjoining on the north The Norman Paper Co.'s property not exceeding 150 feet in width at 50 cents per square foot.

"9. These releases and rights to be given in return for a full and complete release to this company of two rights which you now hold.

"1. The right to pay your rentals in silver bars or its equivalent in gold.

"2. The right to relieve your company of the payment of any annual rent by capitalizing the same at 6 percent and paying such amount to this company as a gross rental."

In this connection there was also introduced by the defendant a vote of the directors of the plaintiff corporation passed in December, 1900, as follows:

"The president and treasurer submitted a proposition pending with the American Writing Paper Company giving said paper com-

pany additional privileges in connection with the water powers now held by it, and also the release of certain reserved rights in its real estate in exchange for the release of the bar silver rental as now provided in its leases, which proposition was explained at length by the president and treasurer. On motion, it was voted that the treasurer be, and he is hereby, authorized and empowered to execute and deliver to the American Writing Paper Company such deeds and contracts as may be deemed necessary to accomplish an adjustment of such matters with said paper company substantially along the lines of the proposition as submitted."

Also the following vote passed in May, 1901:

"The president reported that as yet the officers had not been able to close negotiations with the American Writing Paper Company for the release of the silver clause. The president reported that since the last meeting of the directors proper indentures had been executed with the Newton Paper Company and the Excelsior Paper Company by which the silver clause in their rentals had been released, in exchange for certain releases by this company of reservations in the tenement property of said two corporations."

Other correspondence shows that the plaintiff and the American Writing Paper Company were in substantial accord as to the terms of such a release. Although a release was not executed, the plaintiff by these votes and in its correspondence distinctly recognized the right of the predecessor in title of the defendant to pay the rentals reserved in the indentures in bullion; and, since the releases were not consummated, that right must still exist in the defendant.

Having found that doubt and uncertainty existed as to the meaning of the language employed, we think the District Court was right in finding from all the evidence in the case that, under the indentures in issue here, the parties understood that the rentals were payable in bullion of the fineness of the coinage of 1859. If no uncertainty existed, the evidence admitted bearing on the intent of the parties could not, it is true, be considered to vary the terms of the contract, though admitted without objection; but extraneous evidence is admissible, in case ambiguity or uncertainty exists, to show by subsequent interpretation put on it by the parties themselves what their intent, which they failed to express clearly in their agreement, was. Stone v. Clark, 1 Metc. 378, 381, 35

Am. Dec. 370; Winchester v. Glazier, 152 Mass. 316, 323, 25 N. E. 728, 9 L. R. A. 424.

The judgment of the District Court is affirmed, with costs.