**OTOE COUNTY NAT. BANK et al. v. DELANY.**

**No. 10557.**

Circuit Court of Appeals, Eighth Circuit.

Feb. 1, 1937.

Rehearing Denied March 6, 1937.

Henry Monsky, of Omaha, Neb. (William Grodinsky, of Omaha, Neb., and William H. Pitzer and Marshall Pitzer, both of Nebraska City, Neb., on the brief), for appellants.

Arthur F. Mullen and Herman Aye, both of Omaha, Neb. (John C. Mullen, of Falls City, Neb., and Paul P. Massey, of Omaha, Neb., on the brief), for appellee.

Before STONE, SANBORN, and VAN VALKENBURGH, Circuit Judges.

SANBORN, Circuit Judge.

This is an appeal from a decree for the plaintiff in a suit brought by Frank J. Delany against John W. Berger, Otoe

County National Bank, John K. Morrison, Hyman Greenberg, Dave Cohn, and G. Mozer, to recover part of the purchase price of certain salvage grain bought by Delany from the defendant Berger, as trustee for the other defendants, on the ground that the grain delivered was not up to sample. No decree was entered either for or against Berger, and he is not a party to this appeal. The remaining defendants are all appellants here. The parties will be referred to as in the court below.

There is little controversy as to the facts out of which this case arose, and they may be summarized as follows: In 1926, the D. Sherman Grain Company was indebted to the defendant bank and to the defendants Morrison, Greenberg, Cohn, and Mozer in the total sum of $17,-000. That indebtedness was secured by warehouse receipts covering, in the aggregate, 105,000 bushels of oats and 54,-000 bushels of corn, and by a bill of sale of 50,000 bushels of oats. In order to avoid foreclosing their liens and to facilitate the liquidation of the grain company's indebtedness, a contract was executed by the grain company as first party; the defendants Otoe County National Bank, Morrison, Greenberg, Cohn, and Mozer, as second parties; and the defendant Berger as third party. By this contract the grain company transferred title to all of the grain in the Duff Grain Company elevator at Nebraska City, Neb., to Berger, as trustee, to take possession of the grain, to sell it with the consent of the bank and any one other creditor, and to distribute the proceeds, after deducting expenses, among the defendant creditors in proportion to the principal sum due to each of them. The balance, if any, remaining after payment of the creditors in full was to go to the grain company. Berger was to receive $200 a month for his services in caring for and selling the grain.

After the execution of the contract, Berger began cleaning and conditioning the grain. Negotiations for the purchase of the grain were entered into between the plaintiff and Berger, in which the defendant bank and Mr. Monsky, an attorney who, according to Berger's testimony at the trial, was representing all of the defendants with the exception of the bank, participated. Many offers and counter offers were made before an agreement acceptable to the plaintiff, to Berger, to the bank, and to Mr. Monsky was finally reached. Several offers were rejected because of the disapproval of either the bank or of Mr. Monsky.

Finally, after a thorough investigation by all concerned, and after the plaintiff had received a copy of the contract by which the grain was transferred from the grain company to Berger, a contract of sale was drawn up. This contract, drawn in Mr. Monsky's office, was executed by Berger, and forwarded to the plaintiff for execution, together with a sight draft for $2,500, which was paid by the plaintiff as a guarantee of performance.

The contract provided for the sale to the plaintiff of all of the salvage oats at 15¼ cents per bushel f. o. b. cars Nebraska City, and of all the salvage corn at 27 cents per bushel f. o. b. Nebraska City; and further provided that the corn and oats should conform reasonably to the sample of each furnished to the plaintiff; that the plaintiff, while required to pay for each carload of grain when and as loaded, would nevertheless be entitled to a discount from the purchase price for material variations from the original sample, provided that he made objection prior to the unloading of each car shipped, that he served notice of objection on Berger promptly, and that a fair sample was taken by the Grain Exchange or grain inspector at point of destination, preserved and submitted with Berger's sample of the same carload to any one of three arbitrators named in the contract that Berger should select, this arbitrator to determine the difference between the grain shipped and the original sample, and to award the discount to be allowed.

After the execution of the contract of sale, it was discovered that the arbitrators named therein were unavailable, and the sales agreement was therefore amended by a separate instrument, executed by Berger, designating the firm of P. B. & C. C. Miles, of Peoria, Ill., as arbitrator.

Berger, laboring under great difficulties because of the poor condition of the grain, shipped to the plaintiff about 32,000 bushels of corn and 33,000 bushels of oats from August 19, 1926, to February 4, 1927. The cost of fitting the grain for shipment and shipping it was found to be greater than the price received, so shipments were discontinued and the remaining grain was thrown into the Missouri river.

The plaintiff, as he received the grain shipped to him, notified Berger, as pro-

vided in the contract, that it was of a materially lower quality than the original sample, but each draft for the contract price was paid by him as it was presented. After shipments were discontinued, the plaintiff submitted his samples to the arbitrator, P. B. & C. C. Miles, who found that the grain shipped was inferior to the original average sample, and made an award of $4,199.14 in favor of the plaintiff. A draft for the amount of the award was drawn on Berger, but was not honored.

On October 25, 1927, the plaintiff commenced an action to recover on the award. In his petition he set up the contract of sale, the substitution of arbitrators, the variation in the quality of grain, payment of the contract price, and the award, and prayed judgment in that amount. In their answers, the defendants, other than Berger, alleged, among other things, that the award as made was entirely unauthorized by them.

Upon the trial, at the close of the plaintiff's case, defendants moved for a directed verdict. The trial court—being of the opinion that Berger had no authority to bind the defendants by the appointment of the Miles firm as substitute arbitrator; that the arbitrator, in determining the amount of the award was bound under the contract to compare a sample of each car with the original average sample instead of using a composite sample of all the oats shipped and a sample of all the corn shipped; and that the plaintiff could not recover against the defendant creditors on the award—sustained a motion of the plaintiff to withdraw a juror and to continue the case so that the plaintiff might reshape his pleadings. The continuance was granted on March 27, 1930.

On April 13, 1931, an amended petition was filed which substantially restated the matters set out in the original petition, and alleged that the sums paid to Berger by the plaintiff were converted to their own use by the defendants and were impressed with a trust in favor of the plaintiff. This amended petition prayed for an accounting and equitable relief and "that the defendants and each of them be required to pay to the plaintiff the sums found due to him in such proportion as the court may deem just and equitable."

Defendants moved to dismiss the amended petition on the grounds that any right to recover on the award had been adjudicated and that the claim for damages was barred by the statute of limitations. These motions were overruled, and in December, 1934, the case was tried. At the beginning of the trial, the case was transferred to the equity docket on motion of a defendant.

The lower court did not find that the defendant creditors received from Berger any funds impressed with a trust in favor of the plaintiff, but found that in the preparation of the trust agreement it was the intention "of the defendants other than defendant Berger to control the acts of defendant Berger as their agent, rather than to clothe him with power as a trustee to act independently of their control"; that the bank, through its officers, and Mr. Monsky, acting for the other creditors, were the moving and controlling factors in the negotiations leading up to and in the making of the sales contract; that defendant Berger's only connection with the entire transaction was the care and preparation of the grain for market; that Berger's authority to change the arbitrators as he did was not established and his act in so doing was not ratified by the other defendants, but was repudiated; that "plaintiff purchased from defendants and paid for at the contract price, 32,964.06 bushels of oats and 32,072 bushels of corn, and that the difference in value between the grain he purchased and that which was delivered to him was 10½¢ per bushel or a total of $3461.28 as to the oats, and 13½¢ per bushel or a total of $4329.72 as to the corn and that the grand total for both the oats and corn amounted to the sum of $7791.00."

A decree was entered adjudging that the plaintiff "shall have and recover judgment against the defendants, Otoe County National Bank, John K. Morrison, Dave Cohn, Hyman Greenberg and G. Moser, and each of them for the sum of $12,052.-60 [$7,791.00 plus interest at 7% from October 27, 1927] together with interest thereon at the rate of seven per cent. per annum from the 20th day of August, 1935, until paid. * * *" This appeal followed.

As grounds for reversal, the defendants assert: (1) That the decree is not in conformity with and is not supported by the pleadings; (2) that the trust agreement is unambiguous and cannot be construed to create a relationship of prin-

cipal and agent between the defendant creditors and Berger nor to authorize Berger, as trustee, to obligate them in any way; (3) that the measure of damage was improper and the evidence of damage inadmissible; (4) that the cause of action stated in the amended petition was different than that stated in the original petition and was barred by the Nebraska statute of limitations; (5) that the provisions of the sales contract for determining the plaintiff's damage by arbitration were exclusive.

1. The defendants first contend that the plaintiff in his amended petition prayed for equitable relief and that, no grounds for such relief having been established, the lower court, sitting as a court of equity, erroneously and without jurisdiction so to do, determined a legal issue not presented by the pleadings and as to which the defendants would have been entitled to a trial by jury. They maintain in effect (1) that there are no allegations in the amended petition under which proof of their liability at law could be introduced; and (2) that the court had no jurisdiction to retain the case and enter a money judgment when the alleged equitable cause failed.

The amended petition set out the contract transferring the grain from the grain company to Berger, the contract of sale to the plaintiff, the facts upon which the plaintiff bases his contention that the relation of principal and agent existed between Berger and defendant creditors, the facts concerning the quality of grain sold and of that delivered, the payment of the contract price to Berger, the disbursement of those funds by Berger, the award by the arbitrator, and the refusal to pay such award. It was alleged in this petition that the funds received by Berger and by him disbursed were impressed with a trust in favor of the plaintiff. The prayer was "that the Court ascertain and determine the amount due from the defendants to the plaintiff"; that an accounting be had to ascertain in what proportion the defendants shared in the funds received from the plaintiff by Berger; that the court decree that the funds received by Berger and deposited in the bank in his "trustee" account was a trust fund for the protection of the plaintiff; and that the defendants and each of them be required to pay to the plaintiff the sums found due to him in such proportion as the court might deem just and equitable, together with interest at the rate of 7 per cent. per annum from March 5, 1927, on the sums found due; and that the plaintiff have such other and further relief as justice and equity might require.

While the plaintiff was unable to prove that the creditor defendants shared in the funds received by Berger in the sense that they received such funds from him (an accountant's report showed that the funds were all used in the payment of expenses and repayment of money advanced by the bank in connection with the handling of the grain), the proof of damage to the plaintiff and the resulting money decree are within the scope of the allegations and prayer as summarized above.

However, that does not dispose of the question of the jurisdiction of the court below, sitting in equity, to enter the decree for the recovery of damages. In considering that question, the following cases demonstrate the flexibility of the applicable rule:

Quality Realty Co. v. Wabash Ry. Co. (C.C.A.8) 50 F.(2d) 1051, which was a suit brought by the appellant to enjoin the appellee from the use of appellant's trackage and to require appellee to account for past use of such trackage. In an amended petition, the prayer for an injunction was eliminated. The appellant's bill was dismissed. The appellee contended on appeal that the appeal should have been dismissed because appellant's case, under the amended petition, was an action at law. In overruling that contention, this court said [50 F.(2d) 1051, at page 1054]:

"The case, as brought originally, confessedly belonged to a class cognizable in equity. The question presented is whether, since the elimination of the prayer for injunctive relief, it still retains its equitable character sufficiently to permit disposition on the equity side. Beyond question it was tried to the court as an equity case, apparently so considered by court and counsel, and without objection from any source. Consistently with this view, the court entered its decision in the form of a 'final decree.' It has been frequently held that the right to have a cause brought in equity transferred to or tried on the law side of the court may be waived by failure to make timely objection. Greenberg v. Pennsylvania Trust Co. (C.C.A.3) 19 F.(2d) 824; Henderson Tire & Rubber Co. v. Reeves (C.C.A.8) 14 F.(2d) 903, 906; Reynes v. Dumont, 130 U.S. 354, 395, 9 S.

Ct. 486, 32 L.Ed. 934; Street Grading Dist. v. Hagadorn (C.C.A.8) 186 F. 451; Southern Pacific R. Co. v. United States, 200 U.S. 341, 26 S.Ct. 296, 50 L.Ed. 507."

Connecticut Fire Ins. Co. v. McNeil (C.C.A.6) 35 F.(2d) 675, which was an appeal from a judgment for the insured in a suit to reform a policy of fire insurance and to recover thereon. The trial court denied reformation, but held the insured entitled to recover on the policy without reformation. The Circuit Court of Appeals of the Sixth Circuit there said, with respect to the propriety of entering such a judgment in an equity suit [35 F. (2d) 675, at pages 676, 677]:

"Assuming, therefore, without deciding, that the contract was not subject to reformation, the first question which is suggested is as to the jurisdiction of a court of equity to grant relief purely legal in its nature after denial of all equitable remedy. Doubtless the court might have dismissed the bill in its entirety and have remitted the plaintiff to his remedy at law (Kramer v. Cohn, 119 U.S. 355, 7 S.Ct. 277, 30 L.Ed. 439); or, having decided that an equitable action would not lie, but that the plaintiff could recover at law, the suit might have been transferred to the law side of the court under Equity Rule 22 (28 U.S.C.A. § 723), and the legal issues there determined. But we are of the opinion that retention of jurisdiction will not defeat the judgment where, as here, there was no objection and no obvious reason for a jury trial.

"The general rule has been often stated, that, equity 'having properly acquired jurisdiction of a cause for any purpose, it should dispose of the entire controversy and its incidents, and not remit any part of it to a court of law.' Greene v. Louisville & Interurban R. R. Co., 244 U.S. 499, 520, 37 S.Ct. 673, 682, 61 L.Ed. 1280, Ann.Cas.1917E, 88; McGowan v. Parish, 237 U.S. 285, 296, 35 S.Ct. 543, 59 L.Ed. 955; Camp v. Boyd, 229 U.S. 530, 552, 33 S.Ct. 785, 57 L.Ed. 1317. More specifically, 'if a court of equity obtains jurisdiction of a suit for the purpose of granting some distinctively equitable relief * * * and it appears from facts disclosed on the hearing, but not known to the plaintiff when he brought his suit, that * * * the plaintiff is entitled to the only alternative relief possible of damages, the court there may, and generally will, instead of compelling the plaintiff to incur the double expense and trouble of an action at law, retain the cause, decide all the issues involved, and decree the payment of mere compensatory damages.' 1 Pomeroy Equity Jurisprudence (4th Ed.) § 237. Even though the chief equitable relief sought be denied, the court has power to grant other relief of an equitable nature forming no part of the original prayer, such as relief from penalties pendente lite, if there was reasonable ground for plaintiff originally seeking equitable relief (Oklahoma Operating Co. v. Love et al., 252 U.S. 331, 338, 40 S.Ct. 338, 64 L.Ed. 596), and the more recent decisions seem to indicate a similar power in the court as to legal issues, in the interest of avoidance of multiplicity of actions and the early termination of litigation.

"Here, in view of the position taken by the defendant, the right of the plaintiff to sue at law without reformation of the contract was, to say the least, exceedingly doubtful. The case was not one in which the equitable relief sought was the chief purpose of the litigation and the legal relief merely incidental, such as in Munger Laundry Co. v. National Marking Mach. Co., 252 F. 144 (C.C.A.8). Recovery upon the policy was the main purpose; reformation merely an apparently necessary condition precedent. A right to recovery at law was not so apparent as to require the plaintiff to speculate upon the chance of recovery at law. This doubt alone was an answer to the defense of adequate relief at law. Davis v. Wakelee, 156 U.S. 680, 688, 15 S.Ct. 555, 39 L.Ed. 578; Union Pac. R. R. Co. v. Board of Com'rs of Weld County, 247 U.S. 282, 286, 38 S.Ct. 510, 62 L.Ed. 1110; Dawson v. Kentucky Distilleries Co., 255 U.S. 288, 296, 41 S.Ct. 272, 65 L.Ed. 638. 'Distinctively equitable relief' was sought. The court properly acquired and took jurisdiction of the cause. The evidence was heard and the case submitted. No objection was raised, generally or specifically, to the court retaining jurisdiction to decide the legal issue after the equitable issue was determined adversely to plaintiff. The lack of jurisdiction in the court is not so apparent as to permit the judgment to be now so defeated."

Lyons Milling Co. v. Goffe & Carkener (C.C.A.10) 46 F.(2d) 241, 83 A.L.R. 501, which was a suit to recover money alleged to be due on account of purchases and sales of wheat and corn, on several Boards of Trade, made by the plaintiff as

broker for the defendant. The suit was brought in equity on the theory that the account involved many transactions and was complicated, and that there was no adequate remedy at law. It was contended by counsel for defendant that the bill should have been dismissed because there was an adequate remedy at law. It was there said [46 F.(2d) 241, at page 245]:

"Where the district court has jurisdiction of the subject-matter and the parties are before it, the objection that plaintiff has an adequate remedy at law may be waived by defendant. Chicago Bonding & Surety Co. v. United States (C.C.A.7) 261 F. 266; Fay v. Hill (C.C.A.8) 249 F. 415; Alliance Ins. Co. v. Alper-Salvage Co. (C.C.A.6) 19 F.(2d) 828, 830; Miller v. Union Assur. Soc., Ltd. (C.C.A.8) 39 F.(2d) 25, 28; Twist v. Prairie Oil & Gas Co., supra [274 U.S. 684, 47 S.Ct. 755, 71 L.Ed. 1297]. The defendant, by failing to move to transfer the cause to the law docket and by requesting the court to try the cause sitting as a chancellor, waived the objection, if any there was, that plaintiff had an adequate remedy at law."

Twist v. Prairie Oil & Gas Co., 274 U.S. 684, 47 S.Ct. 755, 71 L.Ed. 1297, which was a suit to quiet title, to enjoin a trespass, and to recover damages. On appeal from a decree establishing the rights of the parties in an oil and gas lease and the damages to be recovered by the plaintiffs, this court had held that, because there was an adequate remedy at law, the case must be deemed to have been tried at law in the lower court, and reviewed it in that light. Twist v. Prairie Oil & Gas Co. (C.C.A.8) 6 F.(2d) 347. The Supreme Court held that this court erred in its disposition of the case and said (pages 690, 692 of 274 U.S., 47 S.Ct. 755, 757, 71 L.Ed. 1297):

"The parties cannot, of course, compel the trial court to hear in equity a suit which seeks a legal remedy for a legal cause of action. Lewis v. Cocks, 23 Wall. 466, 23 L.Ed. 70. Nor can the task of reviewing such a case as if it were actually an equity cause be imposed upon the appellate court through consent of the parties. See Elkhart Carriage & Motor Car Co. v. Partin (C.C.A.) 9 F.(2d) 393. Either the trial court or the appellate may, of its own motion, take the objection that the case is not within the equity jurisdiction. Compare Reynes v. Dumont, 130 U.S. 354, 395, 9 S.Ct. 486, 32 L.Ed. 934. But that objection, whether taken in the trial court or in the appellate court, does not go to the power of the court as a federal court. * * *

"The Circuit Court of Appeals, being of opinion that the plaintiffs had not established a right to relief in equity, because there was a plain, adequate and complete remedy at law, might, on the undisputed facts, have reversed the decree on that ground without considering the specific errors assigned, and, rightly or wrongly, it might have ordered the bill dismissed without prejudice to the remedy at law, or might conceivably have ordered the case transferred to the law docket, or might have considered the case on the merits as on an equity appeal, in the view that at such stage of the proceedings it was desirable to hold that the objection to the equity jurisdiction had been waived."

See, also, Southern Pacific R. Co. v. United States, 200 U.S. 341, 349, 26 S.Ct. 296, 50 L.Ed. 507; Cincinnati & C. Traction Co. v. American Bridge Co. (C.C.A.6) 202 F. 184.

In the case at bar the defendants made no objection in the lower court to the trial of the case in equity. In fact, it was upon the motion of one of them that the case was transferred to the equity docket. This court may now consider the objection to equity jurisdiction waived, and we think that the interests of justice require that that be done.

2. The defendants contend that the so-called trust agreement is unambiguous and cannot be so construed as to warrant an inference that the relationship of principal and agent between the defendant creditors and Berger existed.

In determining whether Berger was a trustee for the creditor defendants or whether they were vested with such control over his acts that he was in fact their agent, it is necessary to examine the so-called trust agreement; in so far as it is not entirely clear, in the light of surrounding circumstances and of the subsequent conduct and communications of the parties thereto, evidence of which was admissible as indicating the construction which they placed upon its language. Holyoke Water Power Co. v. American Writing Paper Co. (C.C.A.1) 68 F.(2d) 261, 265; Bricknell v. St. Joseph Stock Yards Bank (C.C.A.8) 81 F.(2d) 471, 473; Claiborne-Reno Co. v. E. I. Du Pont de Nemours & Co. (C.C.A.8) 77 F.(2d) 565.

Under the trust agreement, Berger was vested with complete control so far as the care and conditioning of the grain was concerned. He also was vested with absolute right to possession. However, with respect to his right to sell, it is provided in the agreement:

"The 'Trustee' shall, *with the consent and approval of the Otoe County National Bank and any of the remaining four claimants herein named* and comprising parties of the second part, sell or cause to be sold to the best advantage, when and as soon as market conditions make it practicable, all or any part of the grain, in carload lots or smaller lots, as he deems most advantageous. * * *" (Italics supplied.)

The evidence, much of which consisted of correspondence and telegrams between the plaintiff and Berger, the plaintiff and Stocker (cashier of the bank), and the plaintiff and Mr. Monsky, indicates that the bank and the other creditors, the latter through Mr. Monsky, repeatedly took advantage of their right to disapprove the terms of any proposed sale. The plaintiff testified that, upon his first trip to Nebraska City in connection with the purchase of the grain, he was introduced to Stocker who said that the bank had an interest in the matter and was really in control of the situation. On July 12, 1926, the plaintiff wired Stocker as follows:

"This confirms purchase from J. W. Berger, Trustee of salvage grain now in Duff Elevator Nebraska City as per terms stipulations conditions discussed with you over telephone and confirmed by me in writing by mail today."

On the same day Stocker telegraphed the plaintiff:

"Must decline confirmation of sale Misunderstanding terms named by Berger Writing fully today."

A few days later, Stocker wrote the plaintiff:

"I have just talked to Mr. Monsky who advises that on account of a case in court on Wednesday it would be impossible for him to be with us on that day but that he could be here Thursday for a conference about noon and would either have the other parties with him who are interested in this grain or would come with full authority to transact for them.

"I told him I was asking for this meeting on account of my inability to make satisfactory terms with you and that while you are interested in the purchase of this grain I thought best that all parties concerned both buyers and sellers come together and work out terms of the contract which seemed to meet entirely with his approval."

On July 27, 1926, Stocker again wrote to the plaintiff:

"I have your favor of the 26th and have carefully gone over the contents of your letter and more particularly plans #1, #2 and #3. Plan #1 would not be feasible on a work out for us. I think better of plan #2, with the exception that your prices are too low both on the corn and on the oats. The arbitrary settlement on grades is satisfactory with the exception of the wording in cents per bushel, as a discount might run one half cents instead of full cents. The back billings we can furnish, and your arrangement for deposit is satisfactory also your option for purchasing any salvage grain remaining in the elevator after the 50,000 bushels of corn and the 90,000 bushels of oats at a price not in excess of prices agreed upon. If the $.19 per bushel F O B cars Nebraska City for salvage corn and $.14 per bushel F O B cars Nebraska City for salvage oats, both to be dried and cleaned and reasonably marked 'average' is the best price you have to submit it will be impossible for us to deal."

On July 30, 1926, Mr. Monsky wrote to the plaintiff. The second paragraph of that letter reads:

"I regret exceedingly to have to advise you that after a careful canvass of the situation, those whom I represent have concluded that the salvage grain in the Nebraska City elevator cannot be sold to you upon the basis suggested in your last wire in the light of not only the probability of a larger handling cost than was first estimated, but also in view of the rapidly advancing market and conditions which indicate a continuance of that condition."

In determining whether the provisions of the trust agreement, in the light of the evidence, must be construed to constitute Berger the agent of the defendant creditors so far as the sale is concerned, the following authorities are helpful, although differences in the facts of the cases cited make them difficult of comparison.

In Mechem on Agency, § 43, p. 28, the following statement is found:

"Occasion to distinguish between the two relations [trust and agency] may arise in many ways. A general statute may use one term under circumstances which make discrimination necessary, and the statute of frauds or the statute of limitations may operate differently upon them. But the question most commonly arising is, whether the person who may be either cestui que trust or principal is liable upon contracts made by the person claimed to be agent or trustee. If the person acting be agent the other, whether disclosed or not may be liable as principal; if the person acting be a trustee merely he may bind himself by his contracts, but he can not make the cestui que trust personally responsible. * * *

"For the solution of this difficulty, no inflexible rule can be laid down. Names used are not conclusive, and the case must be determined by the preponderance of the conflicting characteristics contending for recognition."

In Bogert on Trusts and Trustees, § 294, the author, in referring to the liability of shareholders of business trusts, states the general rule with regard to liability of beneficiaries as follows:

"In order to have squarely presented the question of the possibility of securing exemption from personal liability for the shareholders, the trust must be one in which the shareholders have reserved no powers of control over the business or in which the powers reserved are not extensive. It is uniformly held that, if the cestuis may dictate on questions of the management of the trust, they are liable for the debts. This liability is usually rested on the theory that the organization is not then a trust but a partnership or joint stock association in which the trustees are mere agents."

In Morehead v. Greenville Exch. Nat. Bank, 243 S.W. 546, the Texas Court of Civil Appeals, in holding that the trustees of a refining company described as a joint stock association were mere agents of the shareholders under a "declaration of trust" which reserved the power to the shareholders to govern the acts of the trustees by the adoption of by-laws, said (243 S.W. 546, at page 548):

"From the authorities consulted and hereafter referred to it seems that in order to create a trust which exempts the beneficial owners of the property from liability for the debts contracted by the trustee in his official capacity, the latter must have the legal title and the exclusive right of control and management of the trust property for a term, or for the accomplishment of a definite purpose. It must be made to appear that during that time the cestui que trust can exercise no power over the property except to receive the benefits and insist upon the execution of the trust agreement according to its terms. Williams v. Milton, 215 Mass. 1, 102 N.E. 355; Home Lbr. Co. v. Hopkins, 107 Kan. 153, 190 P. 601 [10 A. L.R. 879]; Connally v. Lyons, 82 Tex. 664, 18 S.W. 799, 27 Am.St.Rep. 935; Industrial Lbr. Co. v. Texas Pine Land Ass'n, 31 Tex.Civ.App. 375, 72 S.W. [875] 878; Sergeant v. Goldsmith, 110 Tex. 482, 221 S.W. 259, 10 A.L.R. 742; Wrightington on Unincorporated Associations, pp. 40–61; 20 R.C.L. pp. 1077, 1078. If the beneficiary or cestui que trust, has the power, directly or indirectly, to control the conduct of the trustee by arbitrarily altering the conditions of the trust or the manner of its performance, the business enterprise is legally so much within the control of the beneficiary as to make him responsible to the creditors with whom the trustee officially contracts. In such instances the person denominated 'trustee' is in fact only an agent acting under the dominion of a principal."

In Wells-Stone Mercantile Co. v. Grover, 7 N.D. 460, 75 N.W. 911, 41 L.R. A. 252, it was held that the creditors of an insolvent debtor who transferred his property by deed of trust, in which the creditors joined, to a trustee, who was given full power to continue the business or to sell it at his discretion for the benefit of the creditors, were not liable to other creditors of the trustee from whom he had purchased goods. The court there refused to accept the theory of principal and agent as between the creditor beneficiaries and the trustee, on the ground that the beneficiaries had acquired no greater right of control, or interest in, the business than they had prior to the execution of the trust instrument.

In Home Lumber Co. v. Hopkins, 107 Kan. 153, 190 P. 601, 10 A.L.R. 879, it was held that an agreement providing for transfer of property to trustees, who were given exclusive control of such property and authorized to carry on a business, created a trust and not a partnership where

the only control to be exercised by the beneficiaries was to elect the trustees.

In Goldwater v. Oltman, 210 Cal. 408, 292 P. 624, 629, 71 A.L.R. 871, it was held that under an "agreement and declaration of trust" providing, among other things, that the trustees of a "Massachusetts" or "business" trust should have full authority and control; that title to the property should be vested in them; that they should elect their successors; and that the subscribers were not to be personally liable, the shareholders were not personally liable on a note executed by the president of the board of trustees. In that case the only limitations on the trustees were that they should have no power to mortgage the property of the trust or to change the agreement so as to affect the rights of the cestuis without the consent of the holders of two-thirds of the shares. The trust could be terminated by the unanimous vote of all of the trustees or by a two-thirds vote of the cestuis que trust. The court there said (210 Cal. 408, 292 P. 624, at page 630, 71 A.L.R. 871):

"No other restrictions upon the powers of the trustees than those enumerated are to be found in the trust agreement, nor can the subscribers, under that agreement, exercise any powers not mentioned above. It is to be noted that in the three matters enumerated above the subscribers are only granted one affirmative power—the power to terminate the trust without the consent of the trustees. The other two powers are purely negative; they must give their consent to any change in their legal status, and they must consent to any mortgage, except a purchase-money mortgage, executed by the trustees. No powers of suggestion or control other than those mentioned are conferred. It seems apparent that these rights and powers fall short of making the trustees mere agents of the certificate holders. It seems clear that these limitations on the powers of the trustees leave the trustees the masters, and do not confer upon the subscribers that degree of ultimate control that will make the organization a partnership rather than a trust."

It is safe to say that the beneficiaries of a trust who reserve to themselves or are granted a substantial control over the acts of the trustee make him their agent with respect to the acts over which control is reserved. As to the exact amount of control that may be assumed by the beneficiaries without bringing personal liability upon them, no accurate rule can be formulated from the cases. As said in Mechem on Agency, supra, "Names used are not conclusive, and the case must be determined by the preponderance of the conflicting characteristics contending for recognition." However, in the case at bar it is to be noted that the beneficiaries, the defendant creditors, reserved to themselves, by the terms of the trust agreement, substantial control over the principal purpose of the trust, the sale of the salvage grain, of which they were, in practical effect, the owners; and that there was no limitation on their liability. There is ample evidence to show that their right of control was exercised. Therefore the trial court's finding that Berger acted as the agent of the other defendants for the purpose of negotiating the sale we think must be sustained.

3. Under that portion of their brief designated as "Point 3" defendants argue: (a) That the plaintiff improperly based his testimony as to the amount of his damage on a comparison of the average sample received from Berger prior to the sale with composite samples made up of samples taken from the cars at destination; (b) that the plaintiff's testimony as to damage was inadmissible because the samples claimed to have been received from the state inspection department were not officially identified; (c) that no evidence contradicting, modifying, or supplementing the trust agreement or the sales contract could be considered because those contracts were not ambiguous; and (d) that the record contains no competent evidence from which the difference in the value of the grain sold and that delivered could be determined.

As to the first of these contentions, regarding the comparison of a composite sample of grain shipped with the original average sample, it appears that such comparison was made by the Miles firm, whose award was repudiated by the defendants. The plaintiff, who was shown to be a man of long experience in purchasing and selling salvage grain and who had acted as arbitrator in many grain disputes, had in his possession samples of each car of grain. Berger forwarded one sample of each carload to the plaintiff and the Grain Inspectors forwarded to him another from the destination point. A separate sample of each carload of grain, which the plaintiff testified was taken by him from the

state inspector's sample, was exhibited in court during the trial and presented to the court for comparison although the record does not indicate that these separate samples were formally introduced in evidence, as were the composite samples. The evidence shows that all cars of grain were of a grade inferior to the original sample. No showing was made that the use of a composite sample for comparison, if such were used, would produce a result substantially different from that obtained from a comparison of a sample of each car with the original average sample. The plaintiff testified that he made computations of what the discount should be on each car while the corn was being shipped. He made no statement as to whether he followed the same procedure as to the oats, but in each instance gave his estimate of the fair average discount. It does not appear that he based his estimates on a composite sample. Since the arbitrators originally designated in the sales contract refused to act and since the defendants refused to be bound by Berger's unauthorized appointment of the Miles firm as substitute arbitrator, the defendants are not in a good position to object to the plaintiff's testimony as to actual difference in the value of the grain purchased by him and of that which he received.

■ We think it was not necessary to have official identification of the samples claimed to have been taken by state inspectors, since it is not disputed that the plaintiff received samples of the same cars of grain from Berger. The contract provision requiring the plaintiff to submit to the arbitrator samples taken by state inspectors was complied with as nearly as possible. The arbitrator named by Berger made an award based, presumably, on those samples. The defendants refused to abide by that award. It would be unreasonable to hold that the trial court, in determining actual damages, was limited to such evidence as was available to the arbitrator in case of arbitration.

With respect to evidence considered in construing the trust agreement and the sales contract, the only purpose of considering the communications of the parties during the negotiation of the sale was to determine whether, under the trust agreement, Berger's status was that of trustee or that of agent. The agreement being ambiguous in that respect, these subsequent communications were clearly admissible for that purpose.

■ The defendants' contention that there is no competent evidence from which to determine damages is without merit, since the plaintiff's testimony and the exhibits on which it was based were admissible.

■ 4. The defendants next contend that the cause stated in the amended petition is barred by the Nebraska statute of limitations (Comp.St.Neb.1929, § 20-207) because there is such a departure in the amended petition from the cause of action stated in the original petition that the statute was not tolled by the filing of the latter. This contention must be ruled against the defendants under the decision of this court in Manhattan Oil Co. v. Mosby (C.C.A.8) 72 F.(2d) 840, at page 843, where it is said:

"Manifestly, if a cause of action is actually barred by the statute of limitations it cannot be resurrected by inserting it, through amendment, into a petition which states an entirely different cause of action. It is also true that if the facts upon which an asserted liability rests are so inadequately stated in a petition that the defendants cannot tell upon what grounds or upon what state of facts their liability rests, it will not toll the statute. Defects in a pleading which states the essential facts and is sufficient notice of the plaintiff's claim and the factual basis of it, even though it may be subject to demurrer, will toll the statute. 'Of course an argument can be made on the other side, but when a defendant has had notice from the beginning that the plaintiff sets up and is trying to enforce a claim against it because of specified conduct, the reasons for the statute of limitations do not exist, and we are of opinion that a liberal rule should be applied.' New York Central & Hudson River R. Co. v. Kinney, 260 U.S. 340, 346, 43 S.Ct. 122, 123, 67 L.Ed. 294."

In Friederichsen v. Renard, 247 U.S. 207, at page 210, 38 S.Ct. 450, 451, 62 L. Ed. 1075, the Supreme Court said:

"The cause of action is the wrong done, not the measure of compensation for it, or the character of the relief sought, and, considered as a matter of substance, the change in the statement of that wrong in the amended petition cannot in any just sense be considered a new or different cause of action."

Compare Missouri, Kansas & Texas Ry. Co. v. Wulf, 226 U.S. 570, 33 S.Ct.

135, 57 L.Ed. 355; New York Central & Hudson River R. Co. v. Kinney, 260 U.S. 340, 43 S.Ct. 122, 67 L.Ed. 294; Seaboard Air Line Railway v. Renn, 241 U.S. 290, 36 S.Ct. 567, 60 L.Ed. 1006.

Obviously, the defendants here have had ample notice from the beginning that the plaintiff has been trying to enforce a claim against them because of "specified conduct," and the change in the character of relief sought did not prevent the original petition from tolling the statute of limitations.

5. The defendants' last contention is that the provisions of the contract of sale for determining the plaintiff's damages were exclusive. Those provisions are:

"It is understood and agreed that while 'Delaney' is required to accept and pay for each carload of grain when and as loaded, as hereinabove provided, he may become entitled to discount for material variation from the original sample marked average, provided that as a condition precedent to the right to claim any such discount or reduction, objection must be made by 'Delaney' prior to the unloading of the car at destination, notice of the objection served upon 'Berger' promptly and a fair sample of the car must be taken by the Grain Exchange or grain inspector at point of destination, preserved and submitted together with 'Berger's' sample of the same car, after completion of this contract, to Omaha Grain Exchange Sampling Bureau, Kansas City Grain Exchange Sampling Bureau or Mr. Duff of Nebraska City, Nebraska, whichever Berger shall designate the decision of either the said Omaha Grain Exchange Sampling Bureau, Kansas City Grain Exchange Sampling Bureau or Mr. Duff of Nebraska City, Nebraska, as the case may be, with reference to the variation of any of the said cars from the sample marked average and the amount of discount, if any, to be final, the said Omaha Grain Exchange Sampling Bureau, Kansas City Grain Exchange Sampling Bureau, or Mr. Duff of Nebraska City, Nebraska, whichever one acts in the capacity herein indicated, to keep in mind in making such judgments that there is considerable broken corn in all shipments of this character on account of the drying, loading or handling. 'Berger' will promptly after the total aggregate amount of such discounts, if any, shall have been determined as provided in this contract, pay to 'Delaney' the amount so adjudged to be due and owing to him, the said 'Delaney' having previous thereto in accordance with this contract, paid the full contract price for all said salvage grain."

The three arbitrators named in the sales contract refused to act. Since the contract made no provision for substitution of arbitrators, the refusal of the named arbitrators revoked the provision relative to arbitration. Backus-Brooks Co. v. Northern Pac. Ry. Co. (C.C.A.8) 21 F. (2d) 4; Kimball v. Gilman, 60 N.H. 54; Wolf v. Augustine, 181 Pa. 576, 37 A. 574; Sutton v. Tyrrell, 10 Vt. 91; 5 C.J. p. 60, § 117. Notwithstanding the revocation of this provision, Berger, without authority from the creditor defendants, appointed a substitute arbitrator by way of an amendment to the contract. The plaintiff and Berger then proceeded to carry out the terms of the contract as so amended, the samples being sent to and the award being made by the substitute arbitrator. The defendants then repudiated the substitution and refused to accept the award. Obviously, the plaintiff made every effort to comply with the terms of the contract requiring that the issue of damages be submitted to arbitration, even after that provision was revoked by the arbitrators' refusal to act. His sole remaining recourse was to bring suit for the ascertainment of his damages. He is not, under the circumstances, deprived of a remedy by the provisions of the contract making compliance with the inoperable arbitration agreement a condition precedent to any claim for discounts. See Norwich Union Fire Ins. Society v. Cohn (C.C.A.10) 68 F.(2d) 42, 94 A.L.R. 494, certiorari denied 291 U.S. 665, 54 S.Ct. 440, 78 L.Ed. 1056; Western Assur. Co. v. Decker (C.C.A.8) 98 F. 381.

The decree is affirmed.

On Petition for Rehearing.

PER CURIAM.

In their petition for rehearing the appellants assert that the decree appealed from was erroneous, (1) because it included in the total amount of damages interest at the rate of 7 per cent. upon an unliquidated claim to the date of the decree, and (2) because it provided for interest at the rate of 7 per cent. after the date of the decree, although the legal rate in Nebraska was then 6 per cent.

250

[11] These questions were not argued in the appellants' brief. The general rule is that questions not so argued will not be considered on appeal. United States v. Chicago, B. & Q. R. Co. (C.C.A.8) 82 F.(2d) 131, 133, 106 A.L.R. 942; Schnitzer v. United States (C.C.A.8) 77 F.(2d) 233, 235; Payne v. Ostrus (C.C.A.8) 50 F.(2d) 1039, 1045, 77 A.L.R. 531; Nash v. Rehmann Bros., Inc. (C.C.A.8) 53 F.(2d) 624, 627; Wynne v. Fries (C.C.A.6) 50 F.(2d) 761; Allen v. Hudson (C.C.A.8) 35 F.(2d) 330; Schevenell v. Blackwood (C.C.A.8) 35 F.(2d) 421, 422; Hard & Rand, Inc., v. Biston Coffee Co. (C.C.A.8) 41 F.(2d) 625; Eastman Kodak Co. v. Southern Photo Co., 273 U.S. 359, 369, 47 S.Ct. 400, 402, 71 L.Ed. 684; I. T. S. Rubber Co. v. Essex Rubber Co., 272 U.S. 429, 432, 47 S.Ct. 136, 137, 71 L.Ed. 335; Denver Live Stock Commission Co. v. Lee (C.C.A.8) 18 F.(2d) 11; Harris v. Newsom (C.C.A.8) 23 F.(2d) 652, 654; United States v. Hayes (C.C.A.8) 20 F.(2d) 873, 877; City and County of Denver v. Denver Tramway Corporation (C.C.A.8) 23 F.(2d) 287, 295; Brown Sheet Iron & Steel Co. v. Maple Leaf Oil & Refining Co., Limited (C.C.A.8) 68 F.(2d) 787; E. R. Squibb & Sons v. Mallinckrodt Chemical Works (C.C.A.8) 69 F.(2d) 685, 687; Franklin Sav. Bank of Franklin, N. H., v. Garot (C.C.A.8) 69 F.(2d) 487, 489; United Iron Works, Inc., v. Woolsey (C.C.A.8) 39 F.(2d) 385, 386. The failure of this court to consider such questions would not, of course, furnish a basis for a rehearing.

The question of the right of a court to include interest or its equivalent in computing damages where the claim is unliquidated is, to say the least, a controversial question and one which ought not to be determined upon an ex parte petition.

The Supreme Court in Miller v. Robertson, 266 U.S. 243, at page 258, 45 S.Ct. 73, 78, 69 L.Ed. 265, said: "Generally, interest is not allowed upon unliquidated damages. Mowry v. Whitney, 14 Wall. 620, 653, 20 L.Ed. 860. But when necessary in order to arrive at fair compensation, the court in the exercise of a sound discretion may include interest or its equivalent as an element of damages. See Bernhard v. Rochester German Insurance Co., 79 Conn. 388, 397, 65 A. 134, 8 Ann. Cas. 298; Frazer v. Bigelow Carpet Co., 141 Mass. 126, 4 N.E. 620; Faber v. City of New York, 222 N.Y. 255, 262, 118 N.E. 609; De La Rama v. De La Rama, 241 U.S. 154, 159, 160, 36 S.Ct. 518, 60 L.Ed. 932; The Paquets Habana, 189 U.S. 453, 467, 23 S.Ct. 593, 47 L. Ed. 900; Eddy v. Lafayette, 163 U.S. 456, 467, 16 S.Ct. 1082, 41 L.Ed. 225; Demotte v. Whybrow (C.C.A.) 263 F. 366, 368."

In Concordia Ins. Co. v. School District, 282 U.S. 545, at page 554, 51 S. Ct. 275, 278, 75 L.Ed. 528, the court said: "In the absence of an authoritative state decision to the contrary, there was nothing in either [of two state statutes] which required the trial court in rendering its judgment to depart from the rule in respect of the allowance of interest which this court had recognized, namely, that, even in a case of unliquidated damages, 'when necessary in order to arrive at fair compensation, the court in the exercise of a sound discretion may include interest or its equivalent as an element of damages.' Miller v. Robertson, 266 U.S. 243, 257–259, 45 S.Ct. 73, 78, 69 L.Ed. 265, and cases cited."

In Nebraska the rule appears to be that in computing unliquidated damages for breach of contract, interest may be included. Parkins v. Missouri Pac. Ry. Co., 76 Neb. 242, 107 N.W. 260.

The contention that there is error in the decree because the legal rate of interest in Nebraska after August 9, 1933, was 6 per cent. and not 7 per cent. stands in a different situation. Comp. Stat.Neb. § 45-102, as amended by Neb. Laws 1933, c. 84, § 1, reduced the legal rate from 7 per cent. to 6 per cent. A similar reduction in the interest on decrees and judgments was made by Neb. Laws 1933, c. 85, § 1, amending Comp. Stat.Neb. § 45-103. Whether this was called to the attention of the court below may be doubted, but it is clear that there was error in including interest at the rate of 7 per cent. after August 9, 1933, the effective date of the amendments. Since the case was tried in equity and it was for this court to say whether the decree appealed from should be modified, we think that we may, in the interests of justice, even now order the correction of a plain error called to our attention and about which there can be no controversy.

In computing damages to September 5, 1935, the date of the decree, the court below should not have included more than 6 per cent. interest after August 9, 1933, and should have provided for only 6 per cent. interest after the date of the decree. The mandate of this court will be that the decree be modified accordingly, and, as so modified, affirmed.

The petition for rehearing is denied.